THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BRYAN KILFOY *et al.*, Defendants-Appellants.

Second District   Nos. 83—75, 83—76 cons.

Opinion filed March 8, 1984.

Robert P. Will, Jr., of Woodstock, for appellant Linda Stroh.

Edward D. Triwush and Marshall R. Weinberg, both of Weinberg & Weinberg, and James W. Reilley, of Reilley & Witlin, both of Chicago, for appellant Bryan Kilfoy.

Theodore Floro, State's Attorney, of Woodstock (Phyllis J. Perko and Andrea Becker, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant, Bryan Kilfoy, was charged in McHenry County with unlawful possession of more than 500 grams of a substance containing cannabis, and possession of more than 500 grams of a substance containing cannabis with intent to deliver. (Ill. Rev. Stat. 1981, ch. 56½, pars. 704(e), 705(e).) His pretrial motions to quash the search warrant and suppress the evidence and to suppress statements were denied, and he was found guilty in a bench trial of both offenses. He was sentenced on the count charging possession with intent to deliver to a term of four years in the Department of Corrections, and was fined $25,000.

Defendant, Linda Stroh, was charged in McHenry County with unlawful possession of more than 30 grams of a substance containing cocaine, a controlled substance, with unlawful possession of more than 500 grams of a substance containing cannabis, and with one count each of unlawful possession of those two substances with intent to deliver. Ill. Rev. Stat. 1981, ch. 56½, pars. 1402(a)(2), 704(e), 705(e), 1401(a)(2).

Her pretrial motions to quash the search warrant and suppress the evidence, and to suppress statements, were denied, and her case was consolidated for trial with Kilfoy's. She was found guilty in a bench trial of the unlawful possession charges, and not guilty of the charges of possession with intent to deliver. She was sentenced to a

four-year term of imprisonment on the possession of cocaine count and a two-year term on the possession of cannabis count, the sentences to run concurrently, and fined $4,200. Kilfoy and Stroh's appeals were consolidated on the State's motion.

Three issues are presented: (1) whether both defendants effectively waived their right to trial by jury; (2) whether the court erred in denying both defendants' motions to quash the warrant and suppress the evidence; and (3) whether the court erred in denying Stroh's motion to suppress statements.

On February 5, 1982, at 3:30 p.m., three Chicago police officers conducted a search pursuant to a warrant issued for:

" 'Brian' Male/White Approx. 30 years. 6'0 165 lbs. Brn. hair and 4008 Cherry Valley Road [space] House [space] Crystal Lake, McHenry County, Ill. and seize Marijuana: to wit Cannabis Sativa & Proof of Residency."

The police were admitted to the house by the defendant, Linda Stroh, and were told the defendant, Bryan Kilfoy, was skiing. In response to a question, she stated that she resided in the house. A friend, Stewart Ogan, was also present when the officers arrived.

During the two-hour search of the residence, four burlap bags and three plastic bags of marijuana were found in a crawl space in the basement, and a quantity of cocaine and marijuana was found in one closet of one of the three bedrooms in the house. Stroh was arrested after the marijuana was found in the crawl space. In response to a question during the search of the house, she stated the bedroom in which the cocaine was found was hers.

Kilfoy arrived at the house in a car driven by Matthew Praxmarer after the search was concluded but before the police had departed. An officer approached the car, said "Bryan?" and Kilfoy responded "Yes." He also admitted that he lived in the house. He was then arrested. Four individuals other than Praxmarer had come to the house during the two-hour search; Mark Clodius, Robert Vehe, Keith Jansen, and William Jachimek. All gave their addresses to the police and were released.

During trial, it was revealed that Stroh had lived at the house for about seven months with Kilfoy and his girlfriend, Toni Grill. Stroh assisted Kilfoy and Clodius in a workshop in the basement of the house where the three made jewelry. Vehe also stayed at the house on occasion, and did some carpentry work on the house in lieu of rent. Clodius had also lived at the house for a while, and in his work with Kilfoy in their jewelry business, he was present in the house on a daily basis. He and Kilfoy were co-owners of a jewelry store in Lake

Geneva, Wisconsin; Stroh occasionally worked at the store and also assisted in the jewelry-making at the house. Additionally, Stroh took in sewing. Stroh testified everyone in the house had access to all the rooms, and that the closet in which the cocaine was found was the "junk" closet. She denied any prior knowledge of the marijuana or the cocaine.

Mark Clodius testified at trial to an incident in which he arrived at the house in late January or early February of 1982, and saw Vehe coming out of Stroh's bedroom. No one else was in the house at the time, and Vehe appeared very nervous. Clodius also testified Vehe often used the crawl space, and that Kilfoy did not.

Kilfoy testified Vehe did not pay any rent, did some carpentry work around the house, and was supposed to be cleaning the crawl space during the month prior to the search. Kilfoy stated he had not seen Vehe since the day the search was conducted, and denied he had any knowledge of the contraband discovered during the search.

1. JURY WAIVERS

The defendants make identical arguments, claiming the record fails to show that they effectively waived their right to a jury trial because it does not reflect this right was explained to them; therefore, their written waivers could not be regarded as having been made understandingly and voluntarily. In primary support, they cite *People v. Gaston* (1971), 132 Ill. App. 2d 900, and *People v. Rambo* (1970), 123 Ill. App. 2d 299.

Both cases are distinguishable. In *Gaston*, the defendant entered a negotiated plea of guilty and, except for a written waiver of jury signed by the defendant, the record was completely silent with respect to the right to a jury trial. The court noted the fact of the silent record alone would have been reversible error in light of *Boykin v. Alabama* (1969), 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709. That case resulted in the promulgation of Supreme Court Rule 402, which requires that the record show express admonitions by the trial court and express responses by the defendant with respect to the nature of the charge and the rights the defendant relinquishes by pleading guilty, including the right to a trial of any kind. (87 Ill. 2d R. 402.) The *Gaston* court stated the defendant's written waiver was a sufficient expression of the defendant's desire to reject his right to be tried by a jury, but that the second essential requirement—an indication that the defendant's waiver was understandingly and voluntarily waived—was lacking due to the silent record.

The defendant in *Rambo* was 16 years old, was represented by

counsel, and signed a written waiver. Although the record showed the court advised the defendant he had a right to a jury trial and asked him if he understood that right, the court never asked the defendant or his counsel if he wished to waive that right. Further, the *Rambo* court considered that the mere fact the defendant signed a printed jury waiver did not indicate he had read what he signed, or that he understood what he had signed.

The parties here agree, as they must, that Illinois law affords every person accused of an offense the right to a trial by jury unless that right is understandingly waived by the accused in open court. (Ill. Rev. Stat. 1981, ch. 38, par. 103—6.) The State argues that the defendants, by permitting their attorney, in their presence and without objection, to waive their right to a jury trial, may be deemed to have acquiesced in, and to be bound by, his actions. In support, the State correctly cites *People v. Sailor* (1969), 43 Ill. 2d 256, and *People v. Murrell* (1975), 60 Ill. 2d 287.

The reasoning underlying such a result was commented on in *Sailor*, to-wit: "An accused ordinarily speaks and acts through his attorney, who stands in the role of agent." (*People v. Sailor* (1969), 43 Ill. 2d 256, 260.) The court also cited to an observation which was made in *People v. Melero* (1968), 99 Ill. App. 2d 208, 211-12:

> " 'The trial court was entitled to rely on the professional responsibility of defendant's attorney that when he informed the court that his client waived a jury, it was knowingly and understandingly consented to by his client. Defendant is not permitted to complain of an alleged error which was invited by his behavior and that of his attorney.' " *People v. Sailor* (1969), 43 Ill. 2d 256, 261.

The viability of the court's decision in *Sailor* was challenged—and ultimately reaffirmed—in *People v. Murrell* (1975), 60 Ill. 2d 287. That court noted that it accepted the recommendation of the American Bar Association that the "preferred" procedure be that " '[t]he court should not accept a waiver unless the defendant, after being advised by the court of his right to trial by jury, personally waives his right to trial by jury, either in writing or in open court for the record.' " (*People v. Murrell* (1975), 60 Ill. 2d 287, 291; ABA Standards, Trial by Jury, Standard 1.2(b) (1968).) Nevertheless, although the ABA procedure is preferred, the *Murrell* court found it is not constitutionally required, nor do any statutes or Supreme Court Rules require that it be followed. Notably, the *Murrell* court stated that its Rule 402 "only requires an affirmative showing on the record of a knowing and understanding waiver as to pleas of guilty" and that "[n]either our

rule nor *Boykin* [*Boykin v. Alabama* (1969), 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709] contains a similar requirement concerning the waiver of the right to jury trial." (*People v. Murrell* (1975), 60 Ill. 2d 287, 290.) Importantly, there, as here, the defendants made no contention that the waiver was not voluntary, that either of the defendants wanted or was deprived of a jury trial, or was in any way prejudiced by counsel's waiver on their behalf.

The State additionally cites *People v. Meier* (1975), 30 Ill. App. 3d 1, a case in which the defendant's argument was the same as the defendants' argument here; to-wit: that the record did not indicate that he was informed of his right to a jury trial. That court observed "the better practice" would have been for the court on the record to have specifically advised the defendant of his right to a jury trial; nonetheless, adhering to *Sailor*, the court held the defendant bound by the waiver made in his presence, without any objection, by his own counsel. 30 Ill. App. 3d 1, 8.

■ The record here contains written jury waivers signed by each defendant, and the report of proceedings shows defendants' counsel waived their right to jury trial in open court in their presence without objection. Accordingly, we conclude the defendants effectively waived their right to trial by jury and no reversal on this point is warranted.

## 2. MOTION TO QUASH THE WARRANT AND SUPPRESS THE EVIDENCE

The warrant specified the place to be searched was "4008 Cherry Valley Road [space] House [space] Crystal Lake, McHenry County, Ill." Both defendants contend here, and so argued below, that the court erred in denying their motion to quash on the basis the house in which both defendants resided was not in Crystal Lake; rather, it was in Woodstock. Defendants argue the fact the warrant was executed by Chicago police, rather than local police, coupled with the discrepant address, created such a possibility of confusion as to have invalidated the warrant.

The State correctly points out the defendants' briefs misstate the suppression hearing testimony of the McHenry County building and zoning enforcement officer, Glen Peterson. He did *not* testify that 4008 Cherry Valley Road was within the Woodstock city limits, as defendants assert. He testified the house was in an unincorporated area of McHenry County known as Bull Valley, and was located about five-six miles from Crystal Lake and five miles from Woodstock. Peterson also testified there is only one Cherry Valley Road in McHenry County, and it is the one located in the area known as Bull Valley. At the hearing, Cherry Valley Road was shown in a McHenry County

street and road guide as being in the Woodstock "area." Peterson testified he believed Bull Valley mailing addresses are partly Crystal Lake, partly Woodstock, and partly McHenry. The defendants' mailing address was Woodstock.

Although defendants acknowledge that errors in addresses on search warrants are not *per se* fatally defective (*People v. Fragoso* (1979), 68 Ill. App. 3d 428), they argue that cases in which an inaccurate warrant has been upheld included other factors in the body of the warrant or its supporting affidavit, or by way of surveillance, which tended to negate the potential for confusion. They cite as examples *People v. Bauer* (1981), 102 Ill. App. 3d 31 (city designation omitted on warrant for search of grey house with red trim on the west side of the street was included in support affidavit); *People v. Hicks* (1977), 49 Ill. App. 3d 421 (lack of street address not fatal to warrant where it specified the numbers of the rooms to be searched at the Arlington Park Towers Hotel located at Rowhling Road and Euclid Avenue in Arlington Heights); *People v. Mecca* (1971), 132 Ill. App. 2d 612 (search of house at 3322 South Western Avenue pursuant to warrant for house at 3322 South Western Boulevard upheld in view of proximity of the boulevard and avenue—separated only by 50-foot-parkway—there was no house at that address on the boulevard, and the house on the avenue was the rear house on the lot, and it had imitation brick siding as stated in the affidavit).

The State asserts the standard for the description of the premises in a search warrant is one of reasonable certainty, and the warrant is sufficiently descriptive if it enables the officer, with reasonable effort, to identify the place. (*People v. Watson* (1962), 26 Ill. 2d 203.) In *Watson*, the building to be searched was incorrectly shown as 2300 South State Street; there was no 2300 address, but the first building south of the intersection was 2310 South State Street. The court upheld the search of that building. Similarly, here, the State argues, the only 4008 Cherry Valley Road in McHenry County was the defendants' residence. The State also cites *People v. Kissinger* (1975), 26 Ill. App. 3d 260, where the court upheld a search warrant which showed the address to be searched as " '2028 Highview Road, Tazewell County, Illinois and a building or buildings, or portions thereof.' " (26 Ill. App. 3d 260, 262.) There was evidence there that there were other Highviews in Tazewell County, but there was no finding that there was any other Highview Road in the county. An even stronger argument for upholding the warrant in the instant case, argues the State, may be made because the court here specifically found there was no other Cherry Valley Road in McHenry, except the one on which

defendants' residence was located in the unincorporated area of Bull Valley.

The purpose of the requirement of particularity of description in search warrants is to prevent the use of general warrants which would give the police broad discretion as to where they may search and what they may seize. (*People v. Allison* (1983), 115 Ill. App. 3d 1038, 1043; *Warden v. Hayden* (1967), 387 U.S. 294, 18 L. Ed. 2d 782, 87 S. Ct. 1642.) It was the defendants' burden to establish that the totality of the circumstances could create confusion or ambiguity. (*People v. Fragoso* (1979), 68 Ill. App. 3d 428.) At the suppression hearing, the defendants presented evidence that there were other roadways in McHenry County with the preface "Cherry" such as "Cherry Avenue" and "Cherry Lane." However, there was a specific finding by the court that there was only one "Cherry Valley Road," and that it was in unincorporated Bull Valley. There was also testimony that that area utilizes three different mailing addresses, one of which is Crystal Lake.

There were other identifying factors here which also tended to remove any ambiguity in the warrant. We point out that the entire record may be considered on review of a defendant's motion to quash and suppress and the reviewing court is not limited to reviewing only the evidence produced at the hearing. (*People v. Webb* (1982), 109 Ill. App. 3d 328; *People v. Hall* (1980), 90 Ill. App. 3d 1073, *cert. denied* (1981), 454 U.S. 893, 70 L. Ed. 2d 207, 102 S. Ct. 388; *People v. Dennison* (1978), 61 Ill. App. 3d 473.) The warrant set forth that the person to be searched was "Brian [*sic*]," and defendant Stroh, upon answering the door, advised the officers that "Bryan" was not home, but was skiing. Although defendants seem to suggest that the fact the executing officers were Chicago police officers may have contributed to the ambiguity in carrying out the terms of the warrant, we note that Illinois police officers may execute search warrants anywhere in the State, not just within their own jurisdiction. (*People v. Carnivale* (1975), 61 Ill. 2d 57.) Here, Officer Smith, although a Chicago police officer, testified he had seen the house previously within the month. Although the "house" set forth in the warrant was not otherwise described, certainly Smith's relatively recent observation of the residence is a factor which must be considered in assessing his ability to identify the house "with a reasonable effort."

■ On review, the ruling of the circuit court on the defendants' motion to suppress should not be set aside unless it is found to be clearly erroneous. (*People v. Clark* (1982), 92 Ill. 2d 96; *People v. Gulley* (1982), 111 Ill. App. 3d 1091.) For the reasons set forth above, we

believe the court correctly denied the defendants' motion to suppress the warrant.

3. MOTION TO SUPPRESS STATEMENTS

Only defendant Stroh raises as error the denial of the motion to suppress statements made on behalf of both of the defendants. Her argument here hinges on her assertion that she made two statements—that she resided in the house and that the bedroom in question was hers—without having been advised of her *Miranda* rights. As pointed out by the State, however, the record clearly shows the second statement about the bedroom was made by her after she had been arrested and advised of her *Miranda* rights. Officer Smith testified Stroh was arrested after the four bales of marijuana were found in the crawl space, that he advised her of her *Miranda* rights, and that he proceeded to search the upstairs. When he discovered the contraband in the bedroom closet, he testified he leaned over the railing of the loft above the front room where Stroh was sitting and asked whose bedroom it was. She replied that it was hers. Consequently, the only question is whether the officer's inquiry as to whether she resided there should have been suppressed because she had not yet been advised of her *Miranda* rights.

Two cases cited by the defendant lend no support to her position: *Orozco v. Texas* (1969), 394 U.S. 324, 22 L. Ed. 2d 311, 89 S. Ct. 1095, and *People v. Clark* (1980), 84 Ill. App. 3d 637. In *Orozco*, the questioning was much more extensive and pointed than that here. Police in that case were admitted to the sleeping defendant's bedroom. "From the moment he gave his name" he was under arrest. (*Orozco v. Texas* (1969), 394 U.S. 324, 325, 22 L. Ed. 2d 311, 314, 89 S. Ct. 1095, 1096.) Without advising the defendant of his *Miranda* rights, officers proceeded to question him and elicited responses which placed the defendant at the scene of a murder and during which questioning the defendant admitted ownership and the location of the gun which fired the fatal shot. His conviction was reversed on the basis the use of his admissions—obtained in the absence of *Miranda* warnings—violated the self-incrimination clause of the fifth amendment. In *Clark*, police officers were called to the scene of an accident where they observed a man slumped behind the wheel of a car. Bystanders pointed out the man's wife nearby. After confirming that the defendant was the shooting victim's wife, the officer had her and a woman friend of hers sit in the squad car. He then asked the defendant "What happened?" and she responded: "I shot my husband." Rather than giving defendant her *Miranda* rights, however, the officer asked the woman

friend to leave the car, and he continued to question the defendant about the circumstances of the shooting. The court there determined the officer's initial question, "What happened?" qualified as general on-the-scene questioning and not custodial interrogation. The officer's continued questioning after the defendant stated she shot her husband was not general on-the-scene questioning, and due to the absence of *Miranda* warnings, the court reversed and remanded the cause for a new trial. *People v. Clark* (1980), 84 Ill. App. 3d 637, 639.

The defendant contends that she was not free to leave as soon as she opened the door, and that Officer Smith so testified at trial. Further, at the same time, she points out Smith testified she was a "focus of his investigation." Accordingly, she asserts that she should have been advised of her *Miranda* rights.

The State argues that the defendant's pre-arrest detention pursuant to the execution of the search warrant was proper (*Michigan v. Summers* (1981), 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587), and that the statement she made was not made while she was in a "custodial" setting as contemplated by *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. It asserts the Illinois Supreme Court has determined that *Miranda* warnings are not required prior to asking preliminary questions when executing a search warrant, citing *People v. Fischetti* (1970), 47 Ill. 2d 92, and *People v. Stansberry* (1971), 47 Ill. 2d 541. It points out *Orozco*, cited by the defendant above, is distinguished in the *Fischetti* case, as here, by the dissimilar circumstances and the extent of the questioning. It also asserts the defendant's reliance on *People v. Clark* (1980), 84 Ill. App. 3d 637, is misplaced, since the questions of the "general nature" addressed to the defendant here cannot be equated with the continued questioning in that case which occurred after the defendant told the police officer she shot her husband.

As Stroh argues, her residency on the premises and her occupancy of the bedroom where the contraband was found were essential elements in the State's case against her and, as such, her admissions in the absence of *Miranda* warnings should have been suppressed. However, in view of the fact the record shows her admission that the bedroom was hers was made after she had been given her *Miranda* rights, that error, if any, with regard to her prior admission that she lived in the house would be harmless beyond a reasonable doubt.

As the State correctly points out, the Supreme Court recently held in *Michigan v. Summers* (1981), 452 U.S. 692, 705, 69 L. Ed. 2d 340, 351, 101 S. Ct. 2587, 2595, that:

"[A] warrant to search for contraband founded on probable

cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."

In *Summers*, the occupant of a home was detained by the police while they executed a warrant authorizing them to search the home for narcotics. After finding narcotics in the home and ascertaining that the occupant owned the home, the police arrested and searched the occupant, and an envelope containing heroin was found on his person. The occupant was charged with the possession of the heroin. At trial in a Michigan State court, he moved to suppress the heroin as the product of an illegal search in violation of the fourth amendment. The trial judge granted the motion, and quashed the information, and that order was affirmed by both the Michigan Court of Appeals and the Michigan Supreme Court. The United States Supreme Court reversed, holding as stated above, and finding that because it was lawful to detain the occupant until evidence establishing probable cause to arrest him was found, his arrest and the search incident thereto were constitutionally permissible.

Although that court found the occupant's detention did not violate his constitutional right to be secure against unreasonable seizure of his person, it nonetheless noted that his initial detention did constitute a "seizure" within the meaning of the fourth amendment, and the court assumed the seizure, which occurred before he was formally arrested, was unsupported by probable cause. 452 U.S. 692, 696, 69 L. Ed. 2d 340, 345, 101 S. Ct. 2587, 2590-91.

Unlike the instant cause, there was no *Miranda* question presented in *Summers*. It is not known how the police "ascertained" the defendant owned the house, and the first footnote of the court's opinion shows eight occupants of the house were detained during the search. Because of those other occupants, a later footnote in *Summers* indicates that under Michigan law, the fact narcotics had been found in the basement of the defendant's house did not give the officers probable cause to arrest or search him. However, the court noted the issue there was not whether there was probable cause. Similarly here, there is no issue of probable cause.

In commenting on the *Summers* case, Professor LaFave observes:

"Especially because the Court elsewhere refers to the category of persons covered as 'residents' who would ordinarily 'remain in order to observe the search of their possessions,' it would seem that the word 'occupants' is not to be loosely construed as covering anyone present, but instead is to be interpreted literally." (2 W. LaFave, Search and Seizure sec. 4.9, at 57-58 (1984

Supp.).)

In a footnote there, he writes:

"The dictionary definition of 'occupant' is 'one who takes possession under title, lease, or tenancy at will,' or 'one who occupies,' that is, 'reside[s] as an owner or tenant' at, a 'particular place or premises.' [Citation.]" (2 W. LaFave, Search and Seizure sec. 4.9, at 58 n.102 (1984 Supp.).)

He further remarks that the police must make the judgment as to who is an occupant rather than visitor, and in making that determination they surely are entitled to act upon "appearances" without regard to what the true facts ultimately turn out to be. The respondent in *Summers* told the police he had left his keys inside, thus sufficiently giving the appearance, at least, of being an occupant. As LaFave points out, the court in *Summers* "did not discuss at all the necessity for police to make the occupancy determination, and thus did not even say whether they need full probable cause or only a reasonable suspicion that the person detained fits the 'occupant' requirement." 2 W. LaFave, Search and Seizure sec. 4.9, at 58 n.104 (1984 Supp.).

In the case at bar, the "occupancy" determination appears to have been made by simply asking Stroh if she lived there. She contends her affirmative response prior to being given the *Miranda* warnings amounted to a violation of her constitutional rights because she was not free to leave from the time she met Officer Smith at the front door and because Officer Smith testified that she was a focus of his investigation from that point on. The State cogently points out, however, that in determining whether a statement was made in a "custodial" setting—thus mandating *Miranda* warnings—the court must look to the entire circumstances surrounding the questioning, with no single factor controlling, and then objectively evaluate whether a reasonable, innocent person would have believed he was free to leave. (*People v. Savory* (1982), 105 Ill. App. 3d 1023; *People v. Wipfler* (1977), 68 Ill. 2d 158.) Additionally, a police officer's subjective belief, uncommunicated to the person in question, and/or his testimony that the person was not free to leave, is not the controlling factor in deciding whether a person is in custody. *People v. Newsome* (1983), 117 Ill. App. 3d 1005, 1010, distinguishing *People v. Szerletich* (1980), 86 Ill. App. 3d 1121.

■ We agree with the State that the officer's simple inquiry to Stroh, whether she lived there at the time she opened the door or very shortly thereafter, did not amount to custodial interrogation, even if the officer subjectively believed Stroh was not free to leave at

the time. Nothing in the record suggests that Stroh's detention at the time the inquiry was made was any different than the pre-arrest seizure described in *Summers*, and that court specifically found the type of seizure there was "[i]n sharp contrast to the custodial interrogation in *Dunaway* [*Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248], [and] the detention of [the] respondent was 'substantially less intrusive' than an arrest. [Citation.]" *Michigan v. Summers* (1981), 452 U.S. 692, 702, 69 L. Ed. 2d 340, 349, 101 S. Ct. 2587, 2594.

We do not conclude that such an inquiry is necessarily the proper or the most reliable way for the police to make the occupancy determination, or that there could not be other circumstances under which this inquiry might be made which would constitute "custodial interrogation" and require *Miranda* warnings. The inquiry made here under these circumstances, however, appears to fall within the category of preliminary on-the-scene questions which do not necessitate that *Miranda* warnings be given, to-wit: *People v. Fischetti* (1970), 47 Ill. 2d 92 (defendant admitted ownership when police asked "Whose coat?" after they found what appeared to be marijuana in one pocket while executing search warrant for defendant's brother), and *People v. Stansberry* (1971), 47 Ill. 2d 541 (when questioned during police search of the Afro-American Student Association pursuant to a warrant for a search of the defendant and the premises, defendant admitted ownership of several items of clothing, the pocket of one item later found to contain packets of marijuana). In both of those cases, the defendants argued they had not been advised of their constitutional rights as required in *Miranda* before making the statement regarding ownership. In each case, the court noted:

> "The *sine qua non* for invoking the *Miranda* rule is that the interrogation be focused on the accused while he is 'taken into custody or otherwise deprived of his freedom of action [by the authorities] in any significant way.' 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. 1602." *People v. Fischetti* (1970), 47 Ill. 2d 92, 97; *People v. Stansberry* (1971), 47 Ill. 2d 541, 548 (citing *Fischetti*).

Each court found that the circumstances under which the statement was made was hot characterized by the compulsion, danger of intimidation, or trickery which the *Miranda* rule was designed to eliminate and found no violation of the defendant's constitutional rights had occurred. As shown by the record, the circumstances at bar were similarly noncoercive: the question concerning Stroh's residence was only the second question she was asked (the first being

whether "Brian" was in the house); Stroh was not named in the warrant, nor did the supporting affidavit mention any female residents of the house; a male friend, Stewart Ogan, present at the time the officer arrived, was similarly questioned as to his place of residence, as were Clodius, Vehe, Jansen, Jachimek, and Praxmarer, all of whom arrived during the course of the search; the police did not verify the addresses given by those persons; persons who did not give the premises in question as their place of residence were allowed to leave; the search was completed in two hours' time; and although Stroh and Ogan sat in the front room of the house during the search, the record does not show they were confined in that room, at least until such time as the marijuana was discovered in the crawl space and Stroh was placed under arrest. Even though the detention which occurred at bar was technically a "seizure," as characterized in *Summers*, the pre-arrest detention of the occupants of the premises being searched pursuant to the search warrant was nonetheless substantially less intrusive than an arrest or a custodial interrogation situation such as the one which occurred in *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248. Accord, *People v. Townes* (1982), 91 Ill. 2d 32; *cf. People v. Lippert* (1982), 89 Ill. 2d 171 (where the court upheld a procedure, based on less than probable cause to arrest, whereby the defendant was placed in a squad car, and transported a short distance for a show-up before victims of robbery which occurred 35 minutes before in a rural area, noting, however, that *Miranda* warnings were given when the defendant was placed in the squad car, and there was no contention that the warnings were inadequate).

The standard of review of an order denying a motion to suppress is whether the trial court's disposition was manifestly erroneous. (*People v. Kincy* (1982), 106 Ill. App. 3d 250, 256.) No such manifest error is evident in the record below, and no reversal is warranted.

The judgments of the circuit court of McHenry County are affirmed.

Judgments affirmed.

HOPF and VAN DEUSEN, JJ., concur.