2018 IL App (3d) 150594

Opinion filed April 3, 2018

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2018

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Tazewell County, Illinois, |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-15-0594 |
| v. | ) ) | Circuit No. 13-CF-487 |
| STEVE W. GILL, | ) ) ) | Honorable Paul P. Gilfillan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE CARTER delivered the judgment of the court, with opinion.
Justices Lytton and O'Brien concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Steve W. Gill, appeals following his conviction for aggravated arson. He argues on appeal that the evidence presented at trial was insufficient to prove him guilty beyond a reasonable doubt. Defendant also argues that the circuit court erred in failing to suppress certain pieces of evidence at trial. Further, defendant urges that he was denied a fair trial. We affirm in part, reverse in part, and remand for further proceedings.

¶ 2                                          FACTS

¶ 3     The State charged defendant by indictment on September 25, 2014, with aggravated arson (720 ILCS 5/20-1.1(a)(1) (West 2012)) and residential arson (*id.* § 20-1(b)). The

indictment alleged that defendant knowingly damaged the house of Timothy Rayner by fire on June 19, 2012, when he knew or should have known that one or more persons were present within the house.

¶ 4 Defense counsel filed a motion to quash the seizure of defendant's clothing from the Pekin hospital and suppress the clothing as evidence, arguing that the seizure did not meet any exceptions to the warrant requirement. In a separate motion, defendant sought to quash the seizure of his truck from a parking lot in North Pekin on the same grounds. Defendant also filed motions arguing that the seized evidence should be excluded on the grounds that the seizures were executed by East Peoria law enforcement officials, who were without authority to execute those actions in those particular locations.

¶ 5 The circuit court held a suppression hearing on March 13, 2015. At the hearing, Detective David Catton of the East Peoria Police Department testified that he came on duty at 8 a.m. on June 19, 2012. Catton soon thereafter received a phone call from Sergeant Brian Despines, informing him that there had been a house fire at approximately 3:30 that morning. Despines notified Catton that defendant was a suspect, and that he had been transported to the hospital from the Denny's restaurant in North Pekin. Catton first went to Denny's, then, at approximately 10 a.m., to the scene of the fire. He testified that the inside of the burned house smelled of gasoline. He also noticed that a Jeep parked in the driveway of the house smelled of gasoline. Inside the Jeep, Catton noticed a gas can and white rags "similar to the rags that I found in the truck at Denny's."

¶ 6 Catton testified that he went to the Pekin hospital at approximately 2:15 p.m. on June 19, 2012, to speak with defendant. At the hospital, Catton was accompanied by Assistant Chief John

Knapp of the East Peoria Fire Department, East Peoria arson investigator Eric Duckworth, and State Fire Marshal's arson investigator Shane Arndt.

¶ 7 Upon arriving at the hospital, Catton and the other investigators met with Jeffrey Lickiss, who was the nurse attending to defendant. Lickiss told Catton that upon intake defendant had smelled of gasoline. Lickiss escorted the investigators to what Catton described as a common area on the seventh floor of the hospital. Lickiss retrieved defendant's clothing for them. Catton initially testified that Lickiss retrieved the clothing from "behind the counter on that floor." Catton also testified: "[T]he nurse got the clothing that was behind the counter of [defendant]." Later, Catton agreed to defense counsel's assertion that Lickiss had retrieved the clothing "from behind the counter."

¶ 8 Catton testified that Lickiss had retrieved the clothing at the investigators' request, but he did not remember which specific investigator asked for the clothing. The clothing was then laid out upon the floor so that Arndt's canine could perform a free air sniff. After Arndt told Catton that the canine had alerted, Arndt took the clothing into custody.

¶ 9 After the canine free air sniff, Catton and Arndt went to speak with defendant. Catton testified that defendant's room was "right where we were standing" and the door was open. Lickiss indicated which room was defendant's room, and Catton, who was familiar with defendant, could see him through the open door. Catton described defendant's room as a single occupancy, agreeing when counsel referred to it as a "private room."

¶ 10 Lickiss testified that he first saw defendant on the day in question when other hospital personnel needed assistance removing his clothing and establishing IVs. Defendant was lying on a bed in a private room. When Lickiss first entered the room, he asked if defendant had been in

3

an automobile accident, noting the odor of gasoline. Lickiss assisted in the removal of defendant's clothing, and temporarily placed them on the floor in the corner of the room.

¶ 11         A nurse told Lickiss that the police wanted to speak to him. Lickiss assumed that the nurse had told police of his observation of the odor of gasoline. Lickiss then left the room and went to the nurses' station, where he told a police officer that he had smelled gasoline. Lickiss then testified: "He wanted the clothing, so we went back into the room and bagged up the clothing. And I think there was a brief discussion as to whether it should be put into plastic or should be put in paper because the personal belonging bags we have are plastic." The following colloquy ensued between defense counsel and Lickiss:

"Q. And so was any of the clothing taken from behind a counter?

A. I believe that we took the clothing from the room, put it in bags and took it to the nursing station.

Q. Why did you do that?

A. To get it out of the room and then to put it in a centralized secure area.

Q. And did you remove them from the nurse's station after that?

A. I gave them to the police officer from the nurse's station."

Lickiss testified that he did not seek defendant's consent to turn over the clothing because he was unintelligible and not in a state to give consent.

¶ 12         Lickiss further testified that all of the events in question occurred on the first floor of the hospital, in the emergency room (ER). He testified that he had been involved in two recent cases involving the securing of clothing, one of which occurred in the ER, and one of which occurred on the seventh floor. Lickiss recalled that the incident on the seventh floor involved an arson

4

investigator. The ER incident, which Lickiss was testifying to, occurred around 5 a.m. Lickiss did not recall the clothing being laid out on the floor.

¶ 13    Arndt testified that he was an arson investigator for the Illinois State Fire Marshal's arson division. He was notified around 3:30 a.m. on June 19, 2012, of a fire in East Peoria. The course of his investigation led him to the Pekin hospital around 2:30 p.m. He went to the hospital with Catton, Knapp, and Duckworth. Upon arrival, Arndt went to "a nurse's station next to a room." He did not recall which floor they were on, but did remember later that he "went down" to retrieve his canine. He noted that it was "just a hospital room," and not the ER. He described the nurses' station as a large counter with several rooms adjacent to it.

¶ 14    From the nurses' station, Arndt observed defendant lying on a bed, alone in the room. Arndt did not enter the room at that time. Someone—though not Arndt himself—then requested the clothing. Arndt retrieved his canine. Arndt recalled that the clothing was brought to the front of the nurses' station in a single plastic bag; he could smell gasoline when the clothing was first removed from the bag. The canine performed a free air sniff of the clothing. This occurred on the floor in front of the nurses' station. Arndt testified that the canine alerted to the front pocket and leg area of a pair of jeans, but not anywhere else that he recalled. Arndt removed all the clothing from the hospital, with the exception of a pair of boots.

¶ 15    The circuit court denied defendant's motion to suppress. In so ruling, the court commented:

> "I think that issue has been addressed quite clearly in the cases cited with regard to people's clothes in hospitals. To me there's no distinction between an [ER] and a nurse's station on a particular floor. This decision might even be the same even

5

if it was in the defendant's hospital room, but we're not dealing with that situation today."

¶ 16        At a later court date, the circuit court entertained the parties' arguments relating to the jurisdiction of authorities to seize defendant's clothing from the hospital in Pekin and his truck from North Pekin. The court agreed that East Peoria does not adjoin either of those towns, as it is separated from both by the village of Creve Coeur. Nevertheless, the court found that officers retain authority or jurisdiction to investigate offenses and conduct seizures in nonadjoining municipalities.

¶ 17        On May 28, 2015, the circuit court conducted a hearing on defendant's motion to suppress the seizure of his truck. At that hearing, defendant testified that on June 19, 2012, he was at a Denny's restaurant between 4 and 5 a.m. He had driven his 1994 Dodge truck to the restaurant and parked it in the lot. Defendant testified that at some point while eating his breakfast, he "became unconscious." The next thing he remembered was waking up in a private room at the Pekin hospital. Defendant testified that he was released from the hospital around 6 p.m., at which point his brother drove him back to Denny's to retrieve his truck. When he arrived, his truck was no longer in the parking lot.

¶ 18        The State did not call any witnesses at the hearing, arguing that the burden was on defendant. The State argued that "there [was] sufficient evidence from Detective Catton's previous testimony that he had probable cause to seize the Defendant's vehicle."

¶ 19        On May 29, 2015, the State filed a document titled "People's Supplemental Attachment to Response to Motion to Quash Seizure of Motor Vehicle Without Probable Cause." Attached was a copy of Catton's complaint for a search warrant for defendant's truck. The complaint

6

alleged that at approximately 8 a.m. on June 19, 2012, he located defendant's truck.[1] Catton swore in the complaint: "I observed a gas can and several items of clothing in the back of the truck in plain view, as well as rags which were similar in appearance to those found in [the] Jeep." Catton also swore that the truck resembled the one he later saw in surveillance footage. The truck was towed to the East Peoria Police Department at 9:34 a.m. The complaint for search warrant was dated July 9, 2014.

¶ 20    The same day, May 29, 2015, the circuit court issued a written order denying defendant's motion. Specifically, the court found that Catton had probable cause to seize the truck.

¶ 21    On June 3, 2015, defendant filed a motion to reconsider and an objection to the State's supplemental attachment of the search warrant complaint. Defendant argued: "The State chose to not call the Detective Catton [*sic*] to the stand to avoid his cross-examination, but are attempting to use his written words as a substitute." Defendant objected to the warrant complaint being used as evidence at the hearing.

¶ 22    The circuit court agreed that if it considered as evidence the information provided via Catton's search warrant complaint, defendant should be afforded an opportunity to cross-examine Catton. The court ordered Catton to appear for that purpose.

¶ 23    Upon testifying a second time, Catton elaborated on his conversation with Despines when he first came on duty. In addition to the previously provided details, Catton testified that Despines told him a Jeep parked in the driveway of the burned house smelled of gasoline and contained a gas can that did not belong to the occupants of the house. Defendant was a suspect, due to an altercation between him and an occupant of the house earlier that morning.

---

[1]In his complaint for a search warrant, Catton erroneously averred that the truck was towed from a restaurant in East Peoria. Defendant raised this error in pretrial proceedings, but the court ruled the error harmless, reasoning that the search warrant would have been granted regardless of its original location.

7

Despines told Catton that defendant's truck was in the Denny's parking lot and had a gas can in the back. Catton drove to Denny's, where he noticed defendant's truck in the parking lot, with a gas can in the truck bed.

¶ 24　　Catton admitted there had not been a determination that the fire was arson until after Catton had defendant's truck towed. Catton did not learn that information until approximately 10 a.m., when he spoke to the arson investigator. Catton could not make any connection between the gas can in the Jeep and the gas can he observed in the bed of defendant's truck.

¶ 25　　The circuit court denied defendant's motion to reconsider, finding Catton had probable cause to seize the truck.

¶ 26　　At trial, Tim Rayner testified that on June 19, 2012, he lived at 118 West Bluff Street in East Peoria. At the time, Rayner was living with Star Ashley, who was dating one of Rayner's friends. Rayner and Ashley were watching movies in the house around 10 p.m. on June 18, 2012, when a man in a truck arrived, looking for Ashley. The man and Ashley had an argument outside the house about money.

¶ 27　　When the argument eventually ended, the man left in his truck. Later, after receiving a phone call, Ashley asked Rayner to drive her to the Creve Coeur police station. Rayner drove her to the police station in his Jeep and waited outside. Ashley returned to the Jeep approximately 45 minutes later, and they returned to the house on Bluff Street. Rayner parked his Jeep in the driveway. He fell asleep on the couch around 3 a.m.

¶ 28　　Rayner was awakened later by the sound of his smoke alarm. When Rayner awoke, he felt "[a] lot of intense heat" and saw heavy black smoke. He noted: "The kitchen was blazing pretty good." He woke Ashley up, and they left the house. As they left the house, Rayner noticed that one of the kitchen windows "had a hole in it."

8

¶ 29 Rayner was shown a series of photographs of his Jeep. The photographs showed a gas can on the front passenger-side floorboard and a rag on the front driver-side floorboard. He testified that neither of those objects was in the Jeep when he parked it upon returning from the police station. Rayner also testified that after the fire, his Jeep emitted a strong odor of gasoline.

¶ 30 Mark Ehlke, an officer with the Creve Coeur Police Department on June 18, 2012, testified that he was on patrol that night when he responded to a theft call at the Ragon motel. The individual who made the theft complaint was defendant. Defendant told Ehlke that Ashley had taken $310 from his pocket while he slept earlier that day. Ehlke testified that, while he was speaking with defendant, defendant did not emit any particular odors. Ehlke called Ashley, who met him at the police station. He did not arrest Ashley, and allowed her to leave the station around 11:18 p.m.

¶ 31 Duckworth testified that he was an arson investigator with the East Peoria Fire Department. He testified that he arrived at the scene of the fire at 5:05 a.m. In his investigation, he noticed that the Jeep parked in the driveway of the house smelled of gasoline and had a small gas can on the front passenger-side floorboard. Inside the house, Duckworth determined that the fire had originated in the kitchen, against an exterior wall.

¶ 32 Duckworth also noticed physical evidence in the front yard of 112 West Bluff Street, two houses from Rayner's house, in the direction of Meadow Avenue. Duckworth testified that he "found some debris that had been burned that had burned in two different spots. Also, next to one of the debris marks, I found a Bic lighter."

¶ 33 Duckworth testified that, as part of his investigation, he interviewed neighbors living directly across the street from Rayner's house. The neighbors turned over surveillance footage from their home security system. The surveillance video was played in court. At the 4:48:53

9

mark in the video, a dark figure can be seen moving about the vicinity of the house across the street. Twenty-one seconds later, that house erupts into fire. An individual carrying a burning object runs into the street from the area of the house and runs down the street, to the right from the perspective of the camera. After running down the street for about 12 seconds, the individual throws the burning object from his person and continues running off screen. A small fire where the discarded fiery object was thrown remains on screen. Emergency vehicles can be seen arriving approximately eight minutes later.

¶ 34    Duckworth explained that the street seen in the video is Bluff Street, and that the burning house is Rayner's. Duckworth further explained that the individual in the video was running away in the direction of Meadow Avenue and that the area in which the individual discarded the fiery object corresponded with the yard in which Duckworth found burnt debris. He also testified that the time stamp in the video was one hour and 26 minutes fast, meaning the dark figure moving around Rayner's house is first seen at 3:22 a.m. Based on the surveillance footage, the odor of gasoline in the home, and laboratory results indicating the presence of gasoline, Duckworth concluded that the fire had been intentionally set.

¶ 35    The next day, Duckworth went to Go-T's tavern, which was at the corner of Bluff Street and Meadow Avenue, seeking to review its surveillance footage. After viewing the surveillance footage, Duckworth returned to the tavern the next day, June 21, 2012. In a grassy area next to the building, Duckworth found a gray hooded sweatshirt with burn marks on one of the sleeves. Inside a pocket of the sweatshirt was a Bic lighter.[2] Duckworth did not note the size of the sweatshirt.

---

[2]The parties stipulated that the lighter in the sweatshirt was submitted for fingerprint testing, but no latent prints suitable for testing could be found.

¶ 36    Catton testified that he came on duty at 8 a.m. on June 19, 2012. Around that time, he received a phone call from Despines, informing him that there had been a "suspicious" fire in the overnight hours, that there was unexplained gasoline and a gas can in a Jeep, that defendant was a suspect, and that defendant's vehicle was at Denny's in North Pekin. Catton testified that he found defendant's vehicle, a 1994 Dodge truck, in the Denny's parking lot. In the bed of the truck, Catton observed a blanket, a spare tire, a gas can, bar and chain oil, and a tow strap. Catton arranged for defendant's truck to be towed. Catton accompanied the truck to the tow yard and took photographs. The photographs show a large white blanket in the section of the truck bed closer to the cab, as well as fading paint in a jagged or zigzag pattern on the truck's hood. At a later date, Catton obtained a search warrant for defendant's truck. The search revealed a Bic lighter under the truck's front seat.

¶ 37    Catton went to the scene of the fire around 10:30 a.m. Catton observed an odor of gasoline emanating from the Jeep parked in the driveway, as well as a gas can and a white rag on the front floorboards. He testified that the Jeep was open—that is, it likely had a canvas top, but the top was not attached. Catton noted that the rag was similar to those he saw in the bed of defendant's truck.

¶ 38    Catton also viewed the surveillance footage from Go-T's tavern collected by Duckworth. Footage from two different camera angles was played in court. Catton provided extensive testimony throughout the viewing of the surveillance footage. Defense counsel objected, arguing that Catton was interpreting the video, and that the video should instead speak for itself. The court overruled the objection.

¶ 39    The first camera angle shows a street, with a building across that street next to a streetlight. A truck makes a right turn off the road toward the camera at 3:06 a.m. After making

11

the turn, the truck pulls out of sight in the upper left area of the screen. Approximately 12 minutes later, a dark figure can be seen emerging from the general area in which the truck turned out of sight, and walking across the street. Catton explained that the street in view is Meadow Avenue and that the area under the streetlight to which the dark figure walked is the intersection of Meadow Avenue and Bluff Street. Five and a half minutes later, a figure crosses the street in the opposite direction. About two minutes later, a vehicle—of which only a slight portion can be seen—emerges from the lower right portion of the screen and turns right onto the road.

¶ 40         The second camera angle is fixed on a door to a building, which Catton explained was the back door to Go-T's tavern. Just after 3:06 a.m., a dark-colored truck pulls between the door and the camera, then slowly drives off screen to the right. At 3:09 a.m., the truck backs up in the opposite direction. There are contents in the bed of the truck, including a large white area toward the cab-end of the bed, but nothing can be discerned in great detail. Just before 3:25 a.m., the truck's headlights come on, and it turns right as it approaches the door. When slowed, the video seems to show a zigzag pattern on a portion of the truck's hood.

¶ 41         Catton testified that there were several indentifying characteristics on the truck in the surveillance footage that matched defendant's truck. He testified that the zigzag pattern on the hood of the truck in the video matched the pattern of paint fade on the hood of defendant's truck. Catton also testified that the taillights on the truck in the video were recognizable as those of a Dodge Ram truck. He also observed a white blanket and a tire in the back of the truck in the video, matching the contents of defendant's truck.

¶ 42         Catton testified that defendant called him three days after the fire, enquiring about his truck. Catton asked defendant to come to the police station. Defendant never came to the station,

12

and Catton was not able to locate him. After a search warrant was issued, Catton retrieved defendant from Louisiana, Missouri, in June 2014.

¶ 43     At trial, Lickiss testified that around 6 a.m. on June 19, 2012, he received a request from the ER at the Pekin hospital to assist with a patient. Lickiss identified that patient as defendant. Lickiss assisted in removing defendant's clothing and dressing him in a hospital gown. When Lickiss first walked into the room, he noticed the odor of gasoline. After removing defendant's clothing, Lickiss placed the clothing in the corner of the room.

¶ 44     Lickiss testified that he got off duty around 7 that morning. Lickiss returned to the hospital for his next shift around 2 p.m. the same day. At that point, defendant was in room 707 of the intensive care unit (ICU). Lickiss recalled interacting with two police officers that afternoon. He testified:

    "My recollection is, I met them in the [ER], and they said that they had a dog that they were going to do a contraband search with, and that they were specifically looking for the clothing of the individual that was brought in earlier that morning."

Lickiss escorted the investigators to the seventh floor. When Lickiss realized what patient the investigators were referring to, Lickiss told them of his observation of the odor of gasoline. The following colloquy ensued between defense counsel and Lickiss:

    "Q. All right, so did you bring the Defendant's clothes to the law enforcement officers at the hospital that afternoon to be sniffed by this service dog they brought in?

    A. Yes. The [ICU] nurses told me that the paraphernalia was in the room, and his clothing was in the room. They said he was alert, and they had some

13

reservation about going in and getting the clothing, and so I agreed with the officers that I would go in and remove the clothing from the room.

Q. So did you get the clothes to the officers?

A. Yes."

¶ 45 On cross-examination, defense counsel inquired into the specific location of the clothing. Counsel also sought clarification of the inconsistencies with Lickiss's previous testimony.

"Q. Mr. Lickiss, you went into my client's private room and took his clothes?

A. That's correct.

Q. Okay, and were you given permission to do this?

A. I was asked to do it by law enforcement.

* * *

Q. Okay, and the stuff you took was from what location?

A. When I first entered the room, his clothing was up against the–these are glass doors that cover the [ICU] unit, and it was to my immediate left and up against the glass door.

* * *

Q. Okay, and where in that room were they kept?

A. When I contacted them, they were to the left side of the room up towards the front of the room.

Q. What does that mean, when I contacted him?

14

A. When the–if we're talking about the [ICU] encounter, when the police officer asked me to go in and bring his clothing out.

Q. Okay. You located them where in the room again?

A. When I first walked into the [ICU], they were to the left.

* * *

Q. *** You testified in this case before, right?

A. That's correct, at a hearing.

Q. Didn't you say on a prior occasion when you testified before that his clothing was behind the nurse's station?

A. That was a–I misspoke at that hearing.

Q. You lied at that hearing.

A. I did not lie. There were two different cases within the same month or so that were very similar.

Q. So the information you presented at the other hearing was not accurate then?

A. That particular part of it was not accurate.

* * *

Q. Okay. What has happened between the time you last testified under oath and today that the clothing is at a different location today?

A. Well, when I testified during the hearing, when you specifically asked me about the seventh floor, that's when I realized I was actually testifying–I had combined two cases in one."

15

Finally, on redirect examination, the State asked Lickiss if he noticed any odor on defendant's clothing. Lickiss responded: "Just when I initially had contact with him that morning, I could smell it within the confines of the room."

¶ 46    Jennifer MacRitchie, a forensic scientist for the Illinois State Police, conducted testing on the gray sweatshirt Duckworth found near Go-T's tavern. She identified what appeared to be a bloodstain on the sweatshirt. Her testing confirmed that the stain was, in fact, blood. She swabbed the stain and the neckline area of the sweatshirt to test for DNA. Debra Minton, also a forensic scientist, performed the DNA testing on the swabs provide by MacRitchie. From the neckline swab, Minton identified a mixture of DNA from at least three people, none of which was suitable for comparison. DNA testing of the bloodstain revealed a match with defendant's DNA.

¶ 47    Arndt testified that his accelerant-detecting canine, Rusty, can alert to the presence of ignitable liquids. Arndt and Rusty arrived at 118 West Bluff Street at approximately 5 or 5:30 a.m. on June 19, 2012. At the scene, Rusty alerted to numerous locations within the Jeep, including the white rag. Rusty also alerted inside the kitchen. Arndt himself could smell the odor of gasoline while in the kitchen as well. Rusty performed a sniff of defendant's clothing at the Pekin hospital, alerting to a pair of blue jeans. Arndt also took Rusty into defendant's hospital room, where Rusty alerted to defendant's hands. Catton and Duckworth both testified that they could smell the gasoline on defendant's clothing when Arndt conducted the sniff with Rusty.

¶ 48    Kimberly Kunkler, a forensic scientist, testified that the white rag and gas can found in the Jeep, as well as debris from the house all tested positive for gasoline. Kunkler also testified that defendant's clothing tested positive for gasoline, but she could not identify if the gasoline

was on an individual piece of clothing, as the clothing was collected in the same container. She did not know if clothing that had been washed would test positive for gasoline.

¶ 49　　　The defense called Ashley as its first witness. Ashley testified that she had known defendant for four years as her drug dealer and as her friend. During that time, Ashley saw defendant every day. She was with defendant at the Ragon motel on the morning of June 18, 2012. She stole Klonopin and heroin from defendant's pocket while he was sleeping, then left the motel. Later that day, Ashley was at Rayner's house when she received a phone call from defendant. He showed up at the house, and the two "had words" outside regarding the stolen drugs. Ashley saw defendant the day after the fire and consumed drugs with him. Ashley testified that defendant owned a tree service and that mutual friends Nick Tatro and Eddie McIntyre sometimes drove his truck. At the time of the testimony, both Tatro and McIntyre were deceased.

¶ 50　　　Two days after the fire, Ashley was at her grandmother's apartment with defendant. However, defendant "ran" from the apartment when Rayner arrived. Defendant and Rayner did not know each other before the fire.

¶ 51　　　Ashley had watched the security footage taken from the house across the street from Rayner's house. She testified that the individual seen in the video running from the fire was taller and slimmer than defendant was at the time. She also posited that the individual in the video ran differently than defendant.

¶ 52　　　Defendant's daughter, Tracy Davis, testified that defendant called her approximately one week after the fire. He asked if he could stay with her in Missouri, noting that he was sick, out of money, and his car was impounded. Davis picked him up and drove him to Missouri. Defendant eventually moved into a home of his own in Missouri. Davis recalled defendant telling her before

the summer of 2012 that he would like to move to Missouri. Defendant's other daughter, Gabby Baborinas, testified that defendant kept chainsaws and other tools in his truck because of his tree service. He kept a gas can in the truck for the chainsaws.

¶ 53 In closing arguments, the State asserted that the crime in question was committed out of great anger. It repeatedly urged that no one other than defendant had a motive to set Rayner's house on fire, nor was there any evidence that anyone but defendant set the fire.

¶ 54 The jury found defendant guilty. Defendant, in turn, filed a motion for new trial, arguing, *inter alia*, that the circuit court had erred in its rulings on his pretrial motions. The court denied the motion for a new trial. Later, the court sentenced defendant to a term of 12 years' imprisonment for aggravated arson.

¶ 55                                ANALYSIS

¶ 56 On appeal, defendant argues that the State failed to prove him guilty of the charged offenses beyond a reasonable doubt. He also contends that the circuit court erred in failing to suppress as evidence his clothing and his truck and its contents. Finally, he asserts that both Catton's testimony regarding the Go-T's surveillance footage and the State's closing argument deprived him of a fair trial.

¶ 57 Defendant's argument that the evidence was insufficient to prove him guilty beyond a reasonable doubt affords the greatest potential relief. The double jeopardy clause mandates that this court reverse defendant's conviction outright if the evidence was insufficient to prove him guilty beyond a reasonable doubt. U.S. Const., amend. V; *People v. Lopez*, 229 Ill. 2d 322, 367 (2008) ("The State cannot retry a defendant once it has been determined that the evidence introduced at trial was insufficient to sustain a conviction."). Moreover, our supreme court has made clear that in conducting such an analysis, a reviewing court considers all of the evidence

18

presented to the jury, regardless of whether any of that evidence should have been suppressed or deemed otherwise inadmissible. *Lopez*, 229 Ill. 2d at 367; *People v. Olivera*, 164 Ill. 2d 382, 393 (1995) ("[R]etrial is permitted even though evidence is insufficient to sustain a verdict once erroneously admitted evidence has been discounted, and for purposes of double jeopardy all evidence submitted at the original trial may be considered when determining the sufficiency of the evidence."). Defendant's insufficiency of the evidence argument is thus the logical starting point, as its resolution is not contingent upon the resolution of defendant's other arguments, and because a finding of insufficient evidence would, in fact, obviate the need to address those other arguments.

¶ 58                                I. Sufficiency of the Evidence

¶ 59        When a challenge is made to the sufficiency of the evidence at trial, we review to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Baskerville*, 2012 IL 111056, ¶ 31; *People v. Collins*, 106 Ill. 2d 237, 261 (1985). In making this determination, we review the evidence in the light most favorable to the prosecution. *Baskerville*, 2012 IL 111056, ¶ 31.

¶ 60        It is not the purpose of a reviewing court to retry a defendant. *People v. Milka*, 211 Ill. 2d 150, 178 (2004). Instead, great deference is given to the trier of fact. See, *e.g.*, *People v. Saxon*, 374 Ill. App. 3d 409, 416-17 (2007). All reasonable inferences from the record in favor of the prosecution will be allowed. *People v. Bush*, 214 Ill. 2d 318, 326 (2005). " 'Where evidence is presented and such evidence is capable of producing conflicting inferences, it is best left to the trier of fact for proper resolution.' " *Saxon*, 374 Ill. App. 3d at 416 (quoting *People v. McDonald*, 168 Ill. 2d 420, 447 (1995)). The trier of fact is not required to accept or otherwise seek out any explanations of the evidence that are consistent with a defendant's innocence; nor is the trier of

19

fact required to disregard any inferences that do flow from the evidence. *McDonald*, 168 Ill. 2d at 447; see also *Saxon*, 374 Ill. App. 3d at 416-17. Finally, the same standard of review applies regardless of whether the evidence presented at trial is direct or circumstantial. *People v. Pollock*, 202 Ill. 2d 189, 217 (2002). Circumstantial evidence alone will be sufficient to sustain a conviction where it establishes proof beyond a reasonable doubt. *Id.*

¶ 61 Residential arson is committed where a person, by means of fire or explosive, knowingly damages any building that is the dwelling place of another. 720 ILCS 5/20-1(a)(1), (b) (West 2012). Aggravated arson is committed where a person, in committing arson upon a building, knows or reasonably should know that there are one or more people inside. *Id.* § 20-1.1(a)(1). In the present case, it is undisputed that the State introduced evidence sufficient to prove beyond a reasonable doubt that an aggravated arson was committed. Defendant only contends that the State's evidence as to the identity of the arsonist was insufficient.

¶ 62 The evidence presented at trial demonstrated that defendant had a clear motive to commit the charged offense. Ashley had stolen either money or drugs from defendant, and the two had argued about it before the fire. Moreover, that argument occurred in front of the house that would eventually be burned, and the house in which Ashley was staying. Defendant later moved to Missouri and, even more incriminatingly, fled upon the arrival of Rayner at Ashley's grandmother's apartment—despite defendant and Rayner not knowing each other prior to the fire. These actions tend to demonstrate consciousness of guilt.

¶ 63 Other evidence linked defendant to the crime more directly. Multiple witnesses testified to the odor of gasoline present in and around the burned house. Lickiss testified that defendant smelled of gasoline when he first arrived at the hospital around 5 a.m. Ehlke had not noticed such an odor when he met with defendant earlier that evening. Further, a trained canine alerted to

20

the presence of an accelerant on defendant's hands and clothing. That clothing would later test positive for the presence of gasoline.

¶ 64    Most importantly, the State also introduced surveillance footage of the arsonist running from the fire in the direction of Go-T's tavern. The surveillance footage from Go-T's tavern, in turn, showed a truck parking, a figure walking in the direction of Bluff Street, a figure returning from Bluff Street, and the truck leaving the parking lot. This gives rise to the commonsense inference that the individual seen in the two videos is the same individual, as the one who set the fire.[3] Moreover, the truck in the video has characteristics that tend to match those seen in photographs of defendant's truck, such as a large white blanket in the front portion of the truck bed and a zigzag pattern on the truck's hood. Finally, a sweatshirt with what appeared to be burn marks and defendant's DNA was found adjacent to the Go-T's parking lot.

¶ 65    Defendant is correct that all the evidence above is circumstantial in nature. There is no video depicting defendant's face, nor was there an eyewitness. But circumstantial evidence can be sufficient to sustain a conviction, and that is the case here. See *Pollock*, 202 Ill. 2d at 217. Especially in the light most favorable to the State, the evidence produces an undeniably reasonable inference that it was defendant who set the fire. It follows that a rational trier of fact could have found defendant guilty beyond a reasonable doubt of aggravated arson.

¶ 66    In reaching this conclusion, we do agree with defendant that some evidence produced by the State was simply not probative of defendant's guilt. For example, the Bic lighter found in defendant's truck can no more be tied to the Bic lighter found close to the scene of the fire than

_____

[3]Defendant urges on appeal that it cannot be discerned from the Go-T's taverns's footage that the figure coming to and from the direction of Bluff Street is actually a person. Defendant argues: "The animate figure could be a person. It could also be a robot or animal that walks on two legs." We reject this argument. The Go-T's footage, viewed in conjunction with the other surveillance footage that clearly shows a person running toward Go-T's, allows the inference that the figure in the Go-T's footage is, in fact, a person. This inference is far more reasonable than the inference that the Go-T's footage shows a robot or an animal walking on two legs.

21

could any other Bic lighter. Likewise, the ostensible similarities of the gas can and rag in defendant's truck to those found in the Jeep have minimal probative value absent any indication that those items were especially unique. Of course, the lack of probative value of certain pieces of evidence was not fatal to the State's case; as cited above, the remainder of the evidence was sufficient to prove defendant guilty beyond a reasonable doubt.

¶ 67    Defendant also argues that other pieces of evidence introduced by the State could produce conflicting or incomplete inferences. For example, he argues that the gasoline could have gotten on his clothing at an earlier time. Similarly, he posits that the sweatshirt found near the Go-T's parking lot could have gotten there at any time. It is certainly *possible* that defendant simply happened to be wearing clothing that smelled like gasoline, or that a sweatshirt with his DNA and apparent burn marks ended up in the Go-T's parking lot at a separate time. However, this court need not weigh in on the merit of defendant's competing theories. The jury was not required to accept or otherwise seek out any explanations of the evidence that would be consistent with defendant's innocence in the face of other rational inferences, and we defer to the jury where its inferences are rational. *Baskerville*, 2012 IL 111056, ¶ 31

¶ 68                           II. Seizure of Clothing

¶ 69    Defendant next contends that the seizure of his clothing from the hospital was illegal on multiple grounds, and that the circuit court therefore erred in failing to suppress evidence stemming from that seizure. First, he argues that he had a reasonable expectation of privacy in his clothing, and that the seizure of his clothing was in contravention of the fourth amendment. Alternatively, he argues that the authorities at the hospital did not have jurisdiction to effectuate a seizure in Pekin.

22

¶ 70     When reviewing the circuit court's ruling on a motion to suppress evidence, we apply a two-part standard of review. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). Findings of fact made by the circuit court are reviewed for clear error, and only reversed if they are against the manifest weight of the evidence. *Id.* However, the ultimate decision of whether or not suppression is warranted is a question of law that is reviewed *de novo*. *People v. Harris*, 228 Ill. 2d 222, 230 (2008). "A reviewing court, however, remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted." *Luedemann*, 222 Ill. 2d at 542 (citing *People v. Pitman*, 211 Ill. 2d 502, 512 (2004)).

¶ 71     The fourth amendment to the United States Constitution and article I, section 6, of the Illinois Constitution protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. While defendant emphasizes the seizure of his clothing, it is apparent that the events in question raise issues related to both search and seizure. The United States Supreme Court has described those separate concerns as follows: "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

¶ 72                              A. Factual Findings

¶ 73     The testimony adduced at defendant's initial suppression hearing was inconsistent as to the precise location of defendant's clothing within the hospital. Catton initially testified that Lickiss retrieved the clothing from "behind the counter on that floor," apparently referring to the nurses' station in the common area of the floor. Catton also agreed when defense counsel asked

23

if Lickiss had retrieved the clothing "from behind the counter." However, Catton also testified that "the nurse got the clothing that was behind the counter of [defendant]."[4]

¶ 74    Lickiss was, by his own admission, slightly confused during his testimony, either confusing defendant's case with another case, or confusing his first encounter with defendant that day with his later encounter. In any event, Lickiss testified: "He wanted the clothing, so we went back into the room and bagged up the clothing." Lickiss also stated: "I believe that we took the clothing from the room, put it in bags and took it to the nursing station." Later, however, Lickiss perhaps implied a two-step process, whereby he first took defendant's clothing from the room to the nurses' station, and then from the nurses' station to the investigators.

¶ 75    In denying defendant's motion to suppress, the court made a factual finding that the clothing had been retrieved from the nurses' station, stating: "To me there's no distinction between an [ER] and a nurse's station on a particular floor. This decision might even be the same even if it was in the defendant's hospital room, but we're not dealing with that situation today."

¶ 76    Because defendant properly filed a posttrial motion, seeking reconsideration of the suppression rulings, we must also consider evidence adduced at trial in conducting our analysis. *People v. Brooks*, 187 Ill. 2d 91, 127-28 (1999); *People v. Strong*, 316 Ill. App. 3d 807, 813-14 (2000). By filing a motion to reconsider, defendant provided the circuit court an opportunity to rule upon the suppression in light of any additional relevant trial evidence, and thus avoided a procedural default. See *People v. Nitz*, 219 Ill. 2d 400, 424 (2006); see also *People v. Rosenberg*, 213 Ill. 2d 69, 81 (2004) (noting that the circuit court's ruling on a motion to suppress remains subject to change until final judgment).

---

[4]The structure of this sentence invites the interpretation that rather than the counter at the nurses' station, Lickiss retrieved the clothing from some counter belonging to defendant.

¶ 77        Lickiss's testimony at trial was far more cogent than that presented at the suppression hearing. At trial, Lickiss stated repeatedly that he had retrieved the bag of defendant's clothing from his hospital room. He recalled the room number, the specific location of the clothing within the room, and even other nurses telling him that the clothing was in defendant's room. When confronted with the possibility that he had previously testified that the clothing was at the nurses' station, Lickiss disavowed that testimony, stating: "That particular part of it was not accurate." No other new testimony was adduced at trial regarding the precise location of the clothing.

¶ 78        The circuit court did not make any new findings of fact in denying defendant's motion to reconsider. In this context, the lack of new factual findings is best construed as the court's decision to adhere to its original findings. However, in this case, the circuit court's original finding—that the clothing was taken by Lickiss from the nurses' station to the investigators— was severely undermined by Lickiss's clear and unbiased trial testimony that he had actually retrieved them from defendant's room. The only remaining evidence that the clothing had come from the nurses' station was the testimony of Catton, which was itself partially contradictory. See *supra* ¶ 73 n.4. At the time of reconsideration, the circuit court's determination that the clothing had come from the nurses' station was no longer supported by the manifest weight of the evidence. Accordingly, we will proceed by considering the fourth amendment implications of Lickiss removing defendant's clothing from his hospital room.

¶ 79                                  B. Government Agent

¶ 80        It is now axiomatic that the protections of the fourth amendment do not apply " 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.' " *Jacobsen*, 466 U.S. at 113-14 (quoting *Walter v. United States*, 447 U.S. 649, 662 (1980)

25

(Blackmun, J., dissenting, joined by Powell, C.J., and Rehnquist, J.)). "Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities [citations], a question that can only be resolved 'in light of all the circumstances.' " *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 614 (1989) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971)). In determining whether a private party should be considered an agent or instrument of the State, courts frequently consider " '(1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or to further his [or her] own ends.' " *United States v. Souza*, 223 F.3d 1197, 1201 (10th Cir. 2000) (quoting *Pleasant v. Lovell*, 876 F.2d 787, 797 (10th Cir. 1989)); *United States v. Jarrett*, 338 F.3d 339, 344 (4th Cir. 2003); *United States v. Feffer*, 831 F.2d 734, 739 (7th Cir. 1987).

¶ 81    Lickiss is not overtly an agent of the government. He is not a police officer, arson investigator, or state fire marshal. However, we must consider whether the "Government's participation" in Lickiss's action is such that he must be deemed an agent of the government. *Skinner*, 489 U.S. at 614. Here, none of Lickiss's actions were privately motivated. The evidence at the suppression hearing and trial made clear that Lickiss retrieved defendant's clothing at the explicit request of one of the investigators—though it was undetermined which specific investigator made the request. Thus, not only did the government know of and acquiesce to Lickiss's action, it specifically requested them. Moreover, Lickiss clearly took those actions to assist law enforcement efforts. On these facts, it is indisputable that when Lickiss entered defendant's room, he did so as an agent of the government for fourth amendment purposes.

¶ 82                                    C. Reasonable Expectation of Privacy

¶ 83          We must next consider whether Lickiss's entry into defendant's hospital room rises to the level of a "search" for fourth amendment purposes. As stated above, a "search" occurs where "an expectation of privacy that society is prepared to consider reasonable is infringed." *Jacobsen*, 466 U.S. at 113. More recently, the United States Supreme Court has stated:

> "[T]he extent to which the Fourth Amendment protects people may depend upon where those people are. We have held that 'capacity to claim the protection of the Fourth Amendment depends *** upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.' " *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)).

¶ 84          Thus, we must consider whether defendant had a legitimate or reasonable expectation of privacy while in the hospital room. Our supreme court has identified six factors to be considered in making such a determination:

> "(1) ownership of the property searched; (2) whether the defendant was legitimately present in the area searched; (3) whether defendant has a possessory interest in the area or property seized; (4) prior use of the area searched or property seized; (5) the ability to control or exclude others from the use of the property; and (6) whether the defendant himself had a subjective expectation of privacy in the property." *Pitman*, 211 Ill. 2d at 520-21.

¶ 85        In this case, the factors cut in both directions on their face. Defendant, of course, had no ownership interest or possessory interest in the hospital room.[5] It is unclear how long defendant was in the room, with possibilities ranging from 8 hours to 15 minutes. Defendant was in the room legitimately, and likely maintained at least some ability to exclude others from the room. See *infra* ¶ 93. Regarding the subjective expectation of privacy, our supreme court has explained that a "defendant need not have taken affirmative steps to proclaim his expectation of privacy. *** A defendant simply must outwardly behave as a typical occupant of the space in which the defendant claims an interest, avoiding anything that might publicly undermine his or her expectation of privacy." *Pitman*, 211 Ill. 2d at 522. By this standard, it must be concluded that defendant maintained a subjective expectation of privacy.

¶ 86        The evidence in this case shows that defendant was in a single-occupancy hospital room with a door on the seventh floor of the Pekin hospital, what Catton agreed could be called a "private room." It appears that no prior Illinois court has considered whether a defendant enjoys a reasonable expectation of privacy in such a setting. There are cases, however, regarding the expectation of privacy in an ER, which are relevant for comparative purposes.

¶ 87        In *People v. Torres*, 144 Ill. App. 3d 187 (1986), the defendant passed out and awoke later in an ER. A police officer had been called to the hospital on a report of a possible drug overdose. When the officer arrived at the ER, he noticed a plastic bag containing a leafy substance protruding from the defendant's jeans. The officer also noticed the odor of burnt cannabis. He seized the cannabis and ordered the defendant to empty his pockets, which revealed a small packet of LSD. Medical personnel testifying at the suppression hearing noted that the defendant was in a state of semiconsciousness. *Id.* at 188-89.

_____

[5]While defendant clearly maintained a possessory interest in his own clothing, this is relevant more to a seizure analysis. *Jacobsen*, 466 U.S. at 113.

28

¶ 88    *Torres* was, at bottom, a case turning on the plain-view exception to the warrant requirement. *Id.* at 190. As the court noted, for the plain-view exception to apply, a police officer must view the evidence "from a place where the officer has a legal justification for being." *Id.* The court then found that "the defendant had no reasonable expectation of privacy in the hospital [ER]." *Id.* at 191. Notably, the court made this finding as a way of concluding that the officer was lawfully present in the ER, justifying his plain view seizure of the cannabis. The court did not find that no search had occurred.[6]

¶ 89    The *Torres* court relied on two primary factors in determining that the defendant did not have a reasonable expectation of privacy. First, it noted that the defendant apparently was not "in a position to either permit or deny anyone, including a police officer, access to the [ER]." *Id.* at 190-91. It also pointed out that medical personnel are required by statute to inform police when a person's injuries may have been caused by criminal conduct. *Id.* at 191. In closing, the court reemphasized that the case turned on the plain-view exception, stating: "Had this contraband been in a closed container, screened from public scrutiny, the defendant might successfully argue that an unreasonable search and seizure had occurred." *Id.*

¶ 90    In *People v. Hillsman*, 362 Ill. App. 3d 623, 625 (2005), the defendant was in an ER after having been shot. When officers arrived to speak with the defendant, he told them that he had been shot and what clothing he had been wearing at the time. *Id.* The defendant's clothing was

---

[6]The language employed by the *Torres* court is thus misleading in a significant respect. The plain-view doctrine is an exception to the warrant requirement that allows an officer to seize an item if it is (1) in plain view, (2) its incriminating nature is immediately apparent, and (3) the officer has "a lawful right of access to the object itself." *Horton v. California*, 496 U.S. 128, 137 (1990). The *Torres* court was addressing the "lawful right of access" prong when it determined that the defendant did not have a reasonable expectation of privacy in the ER. However, as we have explained, the "reasonable expectation of privacy" standard is used for determining whether a particular intrusion constitutes a fourth amendment search. *Jacobsen*, 466 U.S. at 113. Without citation or explanation, the *Torres* court grafted that search standard onto the "right of access" prong of the plain-view doctrine, which concerns only warrantless seizures. Simply put, the *Torres* court had no actual reason to consider whether the defendant had a reasonable expectation of privacy, as it was irrelevant to its plain-view analysis.

stored "in a basket under [his] hospital gurney," and when officers noticed what appeared to be blood on the clothing, they seized it. *Id.* at 626. The Fourth District found that the officers had a lawful right to be in the ER, justifying their plain-view seizure of the clothing. Citing *Torres*, the *Hillsman* court based its conclusion on the fact that the presence of officers in an ER is an obvious consequence of the law requiring medical personnel to report potentially criminal activity. *Id.* at 632-33. Finally, while the *Hillsman* court noted that the *Torres* court had found no reasonable expectation of privacy in an ER, it did not make the same finding—likely because such a finding would be irrelevant to plain-view analysis (see *supra* ¶ 88 n.6).

¶ 91        We reject any implication from the State that the above cases must control our disposition here. First, both *Torres* and *Hillsman* were decided on the grounds that the plain-view doctrine justified the warrantless seizures in those cases. In the present case, there is no evidence that defendant's clothing was in plain view of the officers or of Lickiss prior to Lickiss entering defendant's room at the officers' request. Indeed, even seeing the clothing from a legal vantage point would not be sufficient, as the incriminating character of seized items must be immediately apparent for the plain-view exception to apply. *Horton*, 496 U.S. at 136. Unlike in those situations where the sight of blood on clothing may be incriminating, officers here actually would have had to *smell* defendant's clothing to know that they were incriminating. Furthermore, because those cases turned on the plain-view doctrine, there was no need for either court to determine whether a reasonable expectation of privacy existed, a standard used for determining whether a fourth amendment search has taken place. *Jacobsen*, 466 U.S. at 113; see *supra* ¶ 88 n.6.

¶ 92        Of course, *Torres* and *Hillsman* are also distinguishable from the present case in that they concerned ERs, while this case deals with a private hospital room. Nevertheless, the specific

30

characteristics of the ERs in these cases are useful as contrast. As the *Torres* court noted, a person cannot restrict access to an ER. Moreover, ERs are designed for temporary, rather than extended stays. See *Buchanan v. State*, 432 So. 2d 147, 148 (Fla. Dist. Ct. App. 1983) (holding that the defendant did not have a reasonable expectation of privacy in an ER where "he could have expected to remain only a few hours at most"). This is illustrated in *Hillsman*, where the officer described the defendant as being on a "gurney," rather than a bed. *Hillsman*, 362 Ill. App. 3d at 626. *Hillsman* and *Torres* did not further delve into the nature of their defendants' specific settings. Accordingly, we do not know whether those ERs were open floor plans, with nothing more than curtains separating beds, or whether each person in the ER was afforded their own personal room.

¶ 93　　　　The characteristics of defendant's accommodations in the present case seems a far cry from an ER. He was located on the seventh floor of the hospital, in a room occupied by him alone, with just a single bed. His room had a door that closed and, presumably, four solid walls. While defendant himself stayed there only for a number of hours—anywhere between 4 hours and 11 hours, specifically—the ICU of the hospital was likely suitable for patients requiring much longer stays. Further, while defendant may not have any ability to restrict access to the seventh floor generally, he likely enjoyed *some* rights regarding visitation in his private hospital room. That is, while doctors and nurses may come and go from his room to provide care, his room was not open to the public in general.

¶ 94　　　　In sum, defendant was legitimately present in a private hospital room suitable for extended stays. The room had a door, which alone implied a certain layer of privacy. Defendant maintained at least some authority to exclude others from this room, and at all times acted in a manner typical of an occupant of that space, thus demonstrating a subjective expectation of

31

privacy. We note further that the concepts of privacy and confidentiality are tantamount concerns in a hospital (see generally 735 ILCS 5/8-802 (West 2016) (codifying doctor-patient privilege); 45 C.F.R. § 160 *et seq.* (2007) (Health Insurance Portability and Accountability Act privacy rule)), indicating that society would recognize that expectation of privacy as reasonable. See *Jacobsen*, 466 U.S. at 113. Accordingly, we find that defendant had a reasonable expectation of privacy in his hospital room.

¶ 95        Without doubt, defendant's expectation of privacy in a hospital room is less than that one would enjoy within their home. However, this should not be equated with having no expectation of privacy at all. For example, the United States Supreme Court has held that a person can have a reasonable expectation of privacy in a hotel room (see *Stoner v. California*, 376 U.S. 483, 490 (1964)) or phone booth (*Katz v. United States*, 389 U.S. 347, 352 (1967)), despite obviously not having ownership or unfettered authority over those places. Similarly, while defendant did not have an ownership or possessory interest in his room, the expectation of some privacy remains reasonable.

¶ 96        We must be careful to clarify our present conclusion. The question of whether a defendant has a reasonable expectation of privacy depends on the totality of the circumstances. *Pitman*, 211 Ill. 2d at 530. These circumstances will vary from person to person and case to case, and it is well-settled that the fourth amendment protects people, not places. *Katz*, 389 U.S. at 351. Thus, cases such as *Torres* and *Hillsman* do not stand for the broad principle that all persons in an ER will not have a reasonable expectation of privacy. Likewise, our conclusion here does not imply that all private hospital rooms must be havens of fourth amendment protections. We simply find that this particular defendant, in the type of hospital room described in this record, enjoyed a reasonable expectation of privacy.

32

¶ 98          Because defendant had a reasonable expectation of privacy in his hospital room, the fourth amendment barred governmental intrusions such as the one undertaken by Lickiss (see *supra* ¶¶ 80-81) without a warrant. U.S. Const., amend. IV. Consequently, we next consider whether the search was supported by some exception to the warrant requirement. The burden is on the State to prove that an exception to the requirement applies. *Chimel v. California*, 395 U.S. 752, 762 (1969); *People v. Kowalski*, 2011 IL App (2d) 100237, ¶ 9 ("Although a defendant initially bears the burden of proof on a motion to suppress, where a defendant makes a *prima facie* case that the evidence was obtained by an illegal search or seizure, the burden shifts to the State to go forward with evidence countering the defendant's *prima facie* case. [Citation.] A defendant presents a *prima facie* case when he demonstrates that the search was conducted without a warrant." (citing *People v. Gipson*, 203 Ill. 2d 298, 307 (2003))).

¶ 99          The United States Supreme Court has held that "when there is probable cause to search and it is 'impracticable' for one reason or another to get a search warrant, then a warrantless search may be reasonable." *Chimel*, 395 U.S. at 773.[7] Those circumstances that make obtaining a warrant impracticable are also known as exigent circumstances. *E.g.*, *People v. Slavin*, 2011 IL App (2d) 100764, ¶ 19. As an example, what has come to be known as the "automobile exception to the warrant requirement" exists on the basis of the inherent mobility of an automobile and the impracticality of obtaining a search warrant. *United States v. Ross*, 456 U.S. 798, 830 (1982) (Marshall, J., dissenting, joined by Brennan, J.). As the Court put it, "the inherent mobility of the vehicle often creates situations in which the police's only alternative to

---

[7]"Requiring police to apply for a warrant if practicable increases the likelihood that a neutral, detached judicial officer will review the case, helping to ensure that there is probable cause for any search and that any search is reasonable." *Missouri v. McNeely*, 569 U.S. 141, 174 (2013).

an immediate search may be to release the automobile from their possession. This alternative creates an unacceptably high risk of losing the contents of the vehicle." *Id.* The Court continued: "In the case of a parked automobile, by contrast, if the automobile is unoccupied, this problem is not presented." *Id.* at 830 n.2.

¶ 100    Probable cause to conduct a search exists when the facts available to an officer are such that a reasonable person would believe that contraband or evidence of a crime is present. *Florida v. Harris*, 568 U.S. 237, 243 (2013). At the time of the search in this case, the investigators knew that there had been a fire in East Peoria, the scene of the fire smelled of gasoline, there was an unexplained gas can in the homeowner's Jeep, and that defendant had argued with an occupant of the home just prior to the fire. Upon the investigators' arrival at the hospital, they learned of Lickiss's observation that defendant had smelled of gasoline when he was admitted to the hospital. These facts certainly provided the investigators probable cause to believe that his clothing might be evidence of a crime.

¶ 101    While the investigators had probable cause to search, the burden remained on the State to show that circumstances existed making it impracticable to obtain a search warrant for the hospital room.

¶ 102    "As an overarching principle, [the United States Supreme Court has] held that if there is a 'compelling need for official action and no time to secure a warrant,' the warrant requirement may be excused." *McNeely*, 569 U.S. at 169 (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)). Just as in *McNeely*, "[t]he exigency exception most on point here is the one for imminent destruction of evidence." *Id.* at 168. The *McNeely* Court explained that the imminent destruction of evidence exception applies where there is a "reasonable belief that critical

34

evidence is being destroyed." *Id.* at 169. In illustrating the concept, the Court also pointed to a prior decision in *Ker v. California*, 374 U.S. 23 (1963) (plurality opinion). The Court explained:

> "[I]n *Ker*, the police had reason to believe that the defendant was in possession of marijuana and was expecting police pursuit. We upheld the officers' warrantless entry into the defendant's home, with the plurality explaining that the drugs 'could be quickly and easily destroyed' or distributed or hidden before a warrant could be obtained at that time of night." *McNeely*, 569 U.S. at 168-69 (quoting *Ker*, 374 U.S. at 40).

¶ 103　　　　The State in the present case produced no evidence indicating the sort of circumstance described by the *McNeely* Court. Initially, neither Catton nor any of the other investigators from the hospital who testified at trial expressed any concerns about defendant destroying evidence, let alone imminently. Further, the gasoline-stained clothing is not of the immediately discardable or destroyable nature of the cannabis reference by the *McNeely* Court. To even possibly destroy the evidentiary value of those clothes, defendant would have had to wash the clothing. Defendant, of course, was in a room in the ICU, and there was no evidence presented that that floor provided the means by which defendant could accomplish that task, or even that defendant was in well enough physical condition to do so. Again, the burden of producing such evidence was on the State. *Gipson*, 203 Ill. 2d at 307.

¶ 104　　　　The list of reasons that the investigator could have practically obtained a warrant is yet longer. Defendant was not even aware that he was being investigated until authorities speaking to him in his room implied as much, which occurred only after the search was conducted. Moreover, unlike the late-night investigation in *Ker*, the search in the present case occurred just

after 2:15 on a Tuesday afternoon.[8] Further, given that there were four investigators at the hospital, it would not have unduly burdened the investigation had they believed it necessary to remain with defendant at the hospital while another or others obtained the warrant. See 20 ILCS 2910/1(a) (West 2012) (dictating that arson investigators have the power to secure and serve search warrants). Given these circumstances, there is no apparent reason that the investigators could not have obtained a warrant.

¶ 105                                                    E. Summary

¶ 106          The evidence adduced at the suppression hearing and trial clearly demonstrates that defendant's clothing was located in a bag within his private hospital room when a group of four investigators arrived at the hospital. When those investigators requested that Lickiss enter defendant's room to retrieve his clothing, Lickiss became an agent of the government for fourth amendment purposes. Because defendant enjoyed an expectation of privacy within that room that society would deem reasonable, Lickiss's entry for the purpose of finding and taking defendant's clothing constituted a search under the fourth amendment. While that search was supported by probable cause, there was no evidence on the record that it would have been impracticable for the investigators to obtain a search warrant prior to conducting that search. Indeed, the record makes quite clear that the investigators had ample time to do so. Accordingly, we find that the search was conducted in violation of the protections of the fourth amendment.

¶ 107          Based on this conclusion, we reverse the circuit court's denial of defendant's motion to suppress, thus holding that everything following Lickiss's entry into defendant's room should be suppressed. This includes the accelerant-detecting canine's alert to the clothing in the common area of the seventh floor, as well as the forensic testing on the clothing. Of course, we also vacate

---

[8]A reviewing court may take judicial notice of the days of the week as they correspond to dates of the month. *E.g.*, *People v. Hawkins*, 284 Ill. App. 3d 1011, 1015 (1996).

defendant's conviction and, based on our prior conclusion regarding the sufficiency of the evidence (see *supra* ¶ 65), remand the matter for further proceedings.

¶ 108    As the trial proceedings have been vacated, we need not consider defendant's other trial-based arguments. However, defendant's other constitutional argument—that the seizure of his truck was invalid—stems from a pretrial ruling. Accordingly, we must address that issue, as it will determine whether further evidence should be suppressed at a potential retrial.

¶ 109                                III. Seizure of Truck

¶ 110    As he did at the trial level, defendant argues that the seizure of his truck should be suppressed on two separate grounds. First, he argues that the seizure was undertaken without probable cause or exigent circumstances. Second, he argues that Catton, an East Peoria detective, did not have the authority to effectuate a seizure in North Pekin.

¶ 111                        A. Probable Cause and Exigent Circumstances

¶ 112    The record demonstrates that defendant's truck was towed from the Denny's parking lot at 9:34 a.m. At that time, Catton knew that there had been a suspicious fire the previous night in East Peoria. Defendant was a suspect in the fire because he had engaged in an altercation with an occupant of the house just before the fire. Catton also knew, via Despines, that there was the odor of gasoline and an unexplained gas can in the Jeep parked in the driveway of the burned house. Catton found defendant's truck at Denny's and observed a gas can and a white rag in the bed.

¶ 113    A reasonable person with Catton's knowledge would likely have believed the truck to contain evidence of a crime. *Harris*, 568 U.S. at 243. To be sure, this is a borderline case. But

where the lone suspect in an apparent arson[9] is found with a gas can and rag in his truck, while a gas can and the odor of gasoline are present at the scene of the fire, would lead a reasonable person to conclude that the truck contains evidence.

¶ 114      At any rate, Catton certainly attained enough facts after visiting the scene of the fire and the hospital to form probable cause to believe evidence was in the truck. While these instances occurred after Catton had the truck towed, they occurred before 6 p.m. that day, when defendant attempted to retrieve his truck from the Denny's parking lot. The 9:34 a.m. seizure did not further Catton's investigation in any way by providing him with any additional evidence. Because defendant was in the hospital until 6 p.m., Catton could have just as easily seized the truck after he visited defendant in the hospital. Thus, even if we found that Catton did not have probable cause at 9:34 a.m., we would find that the formulation of probable cause was inevitable. See *Sutherland*, 223 Ill. 2d at 227-28 ("[The inevitable-discovery] exception [to the exclusionary rule] permits evidence, that would otherwise be inadmissible at trial, to be admitted where the State can show that such evidence 'would inevitably have been discovered without reference to the police error or misconduct.' " (quoting *Nix v. Williams*, 467 U.S. 431, 448 (1984))).

¶ 115      Unlike in our previous analysis concerning defendant's clothing, Catton here *did* have the requisite exigent circumstances necessary to have defendant's truck seized without a warrant. As we have already stated, the inherent mobility of an automobile creates an exigency in and of itself. *Ross*, 456 U.S. at 830. Of course, that exigency is reduced where, as here, the car is parked and driverless. *Id.* at 830 n.2. Nevertheless, Catton, at that point, had no idea when defendant might return for the car, and we must look at the likelihoods as known to Catton at the time.

---

[9]Defendant pointed out repeatedly at the trial level that Catton did not learn with any level of certainty that the fire was an arson until he arrived at the scene around 10 a.m. However, the fact that the fire was described as "suspicious" and that defendant was characterized as a suspect plainly indicates that the fire was being treated as a criminal offense.

Moreover, even with defendant in the hospital, any number of fates could have befallen the truck, such as an acquaintance moving it at defendant's request or Denny's having the truck towed after it sat in the restaurant's parking lot for a number of hours. Most important, however, are the nature of the vehicle and some of the potential evidence. The gas can and rag were in the bed of the truck, exposed to the world. Where the presence of gasoline would be pivotal to any evidentiary value, the potential for the evidence being degraded by weather would be a paramount concern. Catton had probable cause to believe there was evidence of a crime in defendant's truck, and it would have been impracticable for him to obtain a warrant before having the truck towed. Thus, the seizure of truck did not violate defendant's fourth amendment protections.

¶ 116                              B. Catton's Authority

¶ 117          Section 7-4-8 of the Illinois Municipal Code (Municipal Code) dictates that "[t]he police of any municipality in such a police district have full authority and power as peace officers and may go into any part of the district to exercise that authority and power." 65 ILCS 5/7-4-8 (West 2012). Section 7-4-7 of the Municipal Code clarifies that "[t]he territory which is embraced within the corporate limits of adjoining municipalities within any county in this State shall be a police district." *Id.* § 7-4-7. Meanwhile, section 107-4(a-3) of the Code of Criminal Procedure of 1963 provides that any peace officer in the state may conduct a *Terry* stop or make an arrest provided (in relevant part) that "the officer is engaged in the investigation of an offense that occurred in the officer's primary jurisdiction and the temporary questioning is conducted or the arrest is made pursuant to that investigation." 725 ILCS 5/107-4(a-3) (West 2012) (hereinafter the arrest statute).

39

¶ 118       The parties agree that East Peoria and North Pekin are not adjoining municipalities, and that Catton, as an East Peoria detective, thus did not have "full authority and power as [a] peace officer[ ]" within North Pekin. Defendant contends that the arrest statute, by its plain language, allows only *Terry* stops and arrests to be made outside of the police district. He argues: "The statute does not, however, allow a police officer to engage in other conduct, such as general investigations and seizure of property, anywhere in Illinois." Defendant contends that such an interpretation would "completely nullify" section 7-4-8 of the Municipal Code.

¶ 119       Defendant's interpretations of the arrest statute is misguided. The arrest statute, formally titled "Arrest by peace officer from other jurisdiction," only speaks directly to when a peace officer may make an extrajurisdictional arrest or a *Terry* stop. *Id.*; *People v. Wear*, 371 Ill. App. 3d 517, 533 (2007). The arrest statute does not directly comment on other police actions, such as a search or the seizure of property. Thus, it is mistaken to conclude from the statute's silence that the legislature intended to thus bar all *other* extrajurisdictional actions other than arrests. For example, the extrajurisdictional execution of a search warrant is not referenced at all by the arrest statute. Yet, it is well-settled that a search warrant may be executed by officers anywhere in the state. *People v. Carnivale*, 61 Ill. 2d 57, 59 (1975); *People v. Kilfoy*, 122 Ill. App. 3d 276, 283 (1984).

¶ 120       The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature. *People v. Woodard*, 175 Ill. 2d 435, 443 (1997). The arrest statute delineates the situations in which an extrajurisdictional arrest is authorized. While the statute only explicitly references arrests and temporary questioning, it illustrates the legislature's overarching intent that police actions taken outside of their jurisdiction may, in certain contexts, be justified. Based on the legislature's judgment that extrajurisdictional arrests may be warranted in certain

contexts, it follows that the even lesser intrusion of seizure of property would also be warranted in similar contexts. Indeed, the arrest statute specifically contemplates that an officer may conduct an investigation outside of his jurisdiction. It would be absurd to allow an officer to conduct investigations outside his jurisdiction, yet bar him from taking an action as basic as collecting evidence.

¶ 121    Contrary to defendant's assertion, this construction of the arrest statute does not serve to nullify section 7-4-8 of the Municipal Code. To be sure, section 7-4-8 of the Municipal Code— which allows officers to exercise of their "full authority and power" in their police district— necessarily implies that officers must have something less than full authority and power *outside* of that district. 65 ILCS 5/7-4-8 (West 2012). However, our construction of the arrest statute does not result in peace officers having full, unfettered authority and power throughout the state.

¶ 122    The police actions considered in the arrest statute are only authorized in the following situations:

> "(1) if the officer is engaged in the investigation of an offense that occurred in the officer's primary jurisdiction and the temporary questioning is conducted or the arrest is made pursuant to that investigation; or (2) if the officer, while on duty as a peace officer, becomes personally aware of the immediate commission of a felony or misdemeanor violation of the laws of this State; or (3) if the officer, while on duty as a peace officer, is requested by an appropriate State or local law enforcement official to render aid or assistance to the requesting law enforcement agency that is outside the officer's primary jurisdiction; or (4) in accordance with Section 2605-580 of the Department of State Police Law of the Civil Administrative Code of Illinois." 725 ILCS 5/107-4(a-3) (West 2012).

Thus, an officer outside of his jurisdiction remains forbidden from making arrests or seizing property if he does not meet one of the above criteria. This is so because of the negative implication underlying section 7-4-8 of the Municipal Code. As an example, a police officer outside of his jurisdiction for recreational purposes who happens upon evidence of a crime could not seize that evidence himself. Nor could an off-duty police officer outside of his jurisdiction make an arrest. Neither would meet the criteria in the arrest statute, even as construed here. Both hypothetical officers would remain constrained by the limits of the Municipal Code.

¶ 123 In this case, Catton was in North Pekin investigating a potential criminal offense that had occurred in East Peoria—unquestionable part of Catton's primary jurisdiction. He executed the seizure of defendant's truck pursuant to that investigation. Thus, the arrest statute as construed here provided Catton the authority to execute the seizure.

¶ 124          C. Summary

¶ 125 Catton had probable cause to believe that defendant's truck contained evidence of a crime and exigent circumstances existed that would make obtaining a warrant prior to seizing that truck impracticable. Furthermore, Catton was acting within his authority when he executed the seizure. Accordingly, we affirm the circuit court's denial of defendant's motion to suppress evidence stemming from the seizure of his truck.

¶ 126          CONCLUSION

¶ 127 The judgment of the circuit court of Tazewell County is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

¶ 128 Affirmed in part and reversed in part.

¶ 129 Cause remanded.