2025 IL App (1st) 231650-U
Order filed: July 31, 2025

FIRST DISTRICT
FOURTH DIVISION

No. 1-23-1650

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 96 CR 19080 (02) |
| | ) | |
| DESHAWN GARDNER, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Lyle and Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held:* We vacated defendant's conviction, reversed the denial of his postconviction petition, and remanded for a new trial at which certain inculpatory statements shall be excluded.

¶ 2    A jury convicted defendant, Deshawn Gardner, of first-degree murder. Defendant now appeals the third-stage denial of his postconviction petition. Defendant contends he made a substantial showing that at trial, the State violated his right to due process by presenting coerced, involuntary statements of witnesses as evidence against him, and that his counsel provided ineffective assistance by failing to adequately investigate an alibi defense. For the reasons that follow, we vacate defendant's conviction and sentence, reverse the denial of his postconviction

petition, and remand for a new trial at which inculpatory statements made by witnesses Sheila Crosby and Timothy McCoy shall be excluded.

¶ 3    Defendant was charged with the murder of Steven Green (the victim), who died on January 24, 1994, of multiple injuries caused by blunt trauma. At the jury trial, Lance Robinson testified that at about 5 p.m. on January 23, 1994, he was present at a Black Disciples (BD) gang meeting held in apartment 1308 of the building at 4555 South Federal Street (Building) in Chicago. Between 30 and 35 people were inside the apartment, including the victim, who was a BD. Defendant, the highest-ranking BD at the meeting, ordered the victim to stand in the middle of a circle formed by the other BDs in attendance. Defendant repeatedly asked the victim about the location of certain drugs belonging to the gang. The victim denied knowing anything about the drugs, so defendant ordered the BDs to beat him with a wooden table leg or a baseball bat.

¶ 4    On cross examination, Robinson testified that one or two weeks after the victim's death, the police informed him that he could be charged as an accessory to murder. Initially, he claimed not to know anything, but after several hours of interrogation, he gave police a statement implicating defendant. On redirect examination, Robinson testified that his identification of defendant was the truth.

¶ 5    Sheila Crosby testified that on January 23, 1994, she resided in apartment 1308 with her five children and her boyfriend, Eugene Bradford. On January 23, 1994, at about 5 or 6 p.m., she entered her apartment and saw several BDs. They forced her to stay in her bedroom. Later, she heard a lot of mumbling, fussing, and crying, lasting for about 15 to 20 minutes. When she was allowed to leave the room, she saw that her furniture had been moved. She also saw the victim, who was "kind of hurt," walking out of the apartment with two or three other men. Before they

left, a BD placed Bradford's jacket on the victim and left the victim's jacket in her apartment. Crosby did not testify at trial that she saw defendant in her apartment.

¶ 6   Crosby testified that the following day, the police came to her apartment and discovered blood on her floors and walls. The police took her and Bradford to the police station. She did not supply the police with any names or nicknames of the people she had seen in her apartment.

¶ 7   Crosby was confronted with her grand jury testimony in which she implicated defendant. At the grand jury, Crosby testified that at 5 or 6 p.m. on January 23, 1994, she saw 25 to 30 BDs in her apartment, including defendant, the victim, and her nephew Charles Stewart. Defendant was the "minister of the ministers," meaning he was the boss of the BDs. One of the BDs forced her to stay in her bedroom, but because the door was not completely closed, she saw and heard what was happening in the living room. Crosby saw the victim inside a circle of BDs and she heard defendant say that he would receive a "death violation" for stealing two ounces of cocaine. Defendant struck the victim with a wooden table leg while the others kicked, punched, and beat him. After the beating was over, one of the BDs put Bradford's coat on the bloodied victim. About 15 minutes after everyone left her apartment, two BDs returned and took all of the items that had been used to beat the victim. Sometime after midnight, Troy Gardner, defendant's uncle, came to her apartment and told her that he had been sent to take her furniture and burn it because it contained the victim's blood. Crosby testified at the grand jury that her testimony was true and had not been made as the result of threats or promises.

¶ 8   At trial, Crosby testified she had been instructed as to what to say at the grand jury and that her grand jury testimony was false. She also denied telling anyone that she had been threatened by defendant the day after the beating. She then was confronted with her testimony of October 21,

1997, in the trial of Duvalle Walker where she testified that the day after the beating, defendant told her that if she talked to the police, he would kill her and her five children.

¶ 9    Crosby stated at defendant's trial that she implicated defendant in her testimony at the grand jury and at Walker's trial because the police had held her apart from her family for about two days, during which "quite a few detectives" threatened to charge her as an accessory to the murder. Also, Detective McDonald threatened to take her children away from her. Crosby explained that in February 1994, she told a public defender that she had lied to the grand jury. In March 1994, Crosby stated at a court hearing for a codefendant that her identification of defendant at the grand jury was false and made under duress because officers told her "you know we can have your kids tooken [*sic*] from you, you could go to jail because these guys are bad guys and they should go to jail." In January 1998, Crosby told defendant's trial counsel that she gave false testimony implicating defendant because the officers threatened to charge her as an accessory.

¶ 10    Timothy McCoy testified he lived at the Building his entire life and he used to be a member of the BDs. He was not at the meeting in apartment 1308 on January 23, 1994, and did not witness the victim's beating. He knew defendant was a BD, but did not know his rank or nickname.

¶ 11    McCoy was shown a copy of a handwritten statement bearing his signature and dated March 25, 1999, implicating defendant in the victim's beating. McCoy denied making that statement and claimed the police had supplied all of the information in it and that the statement already was written when it was shown to him. McCoy testified that the police choked him in front of the Assistant State's Attorney (ASA), telling him that if he did not "agree to" the statement, they would send him to the hospital and to jail. McCoy identified the police officer who had choked him only as a homicide detective.

¶ 12    ASA Jennifer Coleman testified that on March 24, 1999, McCoy told her that he had been treated well by the detectives and agreed to give a statement, so she asked Detective Murray to enter the room as a witness. She told McCoy he could have a lawyer, but he did not want one. No one grabbed McCoy by the throat in front of her and she did not supply McCoy with a fully written document. Rather, she wrote the statement in front of him as he provided answers to her questions.

¶ 13    ASA Coleman read relevant portions of the statement into the record. McCoy stated that the BDs controlled all the illegal narcotics sales in the Building. Defendant was the highest-ranking BD in the area. James Harris, also known as J.D., was a BD and reported directly to defendant. On January 23, 1994, McCoy attended a meeting in apartment 1308 with 30 other BDs, who formed a circle so that the leaders could stand inside and conduct the meeting. When the victim arrived, J.D. told him to stand in the middle of the circle and questioned him about some missing cocaine. The victim denied any knowledge thereof and J.D. ordered the BDs to beat him with their fists and with a three-foot long stick. After several minutes, J.D. and defendant ordered the beating to stop and defendant questioned the victim about the missing cocaine. Defendant ordered the beating to resume when the victim again denied knowing anything. The cycle of questioning and beating occurred off and on for about 30 minutes, after which defendant called an end to it and McCoy left the apartment. McCoy affirmed in the statement that he had been treated well by the police and was not threatened in any way into making this statement.

¶ 14    Dr. Thamrong Chira, a pathologist, performed an autopsy on the victim on January 24, 1994. In Dr. Chira's opinion, the victim's death was a homicide arising from multiple injuries caused by blunt trauma, which made his brain swell, and caused hemorrhaging in his lung.

¶ 15    Sergeant Sergio Rajkovich testified that on January 24, 1994, he and his partner, Detective McDonald, searched the Building's incinerator room and discovered a wooden table leg on top of

a refrigerator. The table leg was about 36 inches long, was splintered on one end, and had red marks that looked like blood. He called evidence technicians to the scene. At 11:15 p.m. that same day, he, McDonald, and Detectives Kenneth Boudreau and John Halloran went to apartment 1308 and met with Crosby and Bradford.

¶ 16    Halloran testified that on January 24, 1994, he and several other detectives went to apartment 1308. Halloran noticed that the furniture was in disarray and there were blood stains on the floor and on the wall. Crosby told them that the victim had been beaten in her apartment in her presence and that defendant threatened to kill her and her children if she told the police about the identities of the attackers. Halloran and Crosby made arrangements to have her children taken to a family member's home for their own safety. Crosby subsequently supplied the officers with 25 names, nicknames and possible apartments of people involved in the beating. After speaking with Crosby, the detectives began looking for defendant. Defendant was arrested on July 1, 1996.

¶ 17    The defense did not present any evidence.

¶ 18    The jury convicted defendant of first-degree murder. The trial court sentenced him to 85 years' imprisonment based on its finding that the crime was brutal and heinous.  On direct appeal, we affirmed defendant's conviction. See *People v. Gardner,* No. 1–01–2618 (2003) (unpublished order under Supreme Court Rule 23).

¶ 19    On November 30, 2004, defendant filed a *pro se* postconviction petition alleging that his trial counsel provided ineffective assistance by failing to investigate and call as witnesses his girlfriend, Katina Edwards, and his mother, Jacqueleen Brown. Edwards and Brown would have testified defendant was with them at Brown's apartment at 5-6 p.m., when the beating of the victim occurred. Defendant alleged he informed his trial counsel that Edwards and Brown were available and willing to testify at trial and he attached their affidavits to the petition. Edwards attested that

on the day of the crime, January 23, 1994, she and their daughter were with defendant at Brown's apartment and that defendant took Edwards and their daughter home "around 6 o'clock that evening." Brown similarly attested that defendant, Edwards, and their daughter were at her apartment on January 23, 1994. Defendant left her apartment "that Sunday, January 23, 1994, at around 6 or 6:30 that evening to take his family home." Both Edwards and Brown stated that trial counsel never questioned them about their potential alibi testimony.

¶ 20    Defendant further alleged his trial counsel was ineffective for failing to investigate, prepare and present evidence that it was the *modus operandi* of Halloran and Boudreau to coerce witnesses into giving false statements. Finally, defendant alleged that the admission of McCoy's prior inconsistent statement violated his right to due process and that his sentence was unconstitutional.

¶ 21    The postconviction judge (who was different than the trial judge) docketed the petition and appointed counsel. On April 24, 2008, appointed counsel filed a supplemental postconviction petition adopting and incorporating defendant's *pro se* petition. The supplemental petition further alleged that Halloran and Boudreau coerced Crosby and McCoy into implicating defendant and that the State violated his right to due process by using those coerced statements at trial.

¶ 22    In support of the allegation, defendant cited to newly discovered evidence that had emerged since his trial establishing that Halloran and Boudreau engaged in "systematic psychological and physical abuse" against other criminal suspects and witnesses to compel confessions. Specifically, defendant attached several notarized affidavits, all of which were made in 2003 or 2004, subsequent to his trial. Nicholas Escamilla attested that in 1993, Detectives Halloran, Boudreau, O'Brien and Ryan punched, slapped, kicked, and spit on him, and then threatened to arrest his wife and take his child away until he confessed to murder. Andre Brown attested that in September 1996, Halloran and Boudreau threatened he would never see his family again if he did not confess

to murder. Kylin Little attested that in April 1996, O'Brien, Halloran and Boudreau threatened to charge him in connection with a shooting unless he cooperated with them, and then Boudreau repeatedly struck Little on the head and chest while O'Brien and Halloran held him down until he made an incriminating statement about the suspect. Jason Miller attested that in April 1996, O'Brien and Halloran held him down while Boudreau beat him in order to compel him to make an incriminating statement about a shooting suspect.

¶ 23    Defendant also attached a copy of a civil complaint filed against Detectives Boudreau, Halloran, O'Brien and Foley on July 5, 2002, seeking damages for excessive force, intentional infliction of emotional distress, failure to intervene, conspiracy to use excessive force, and civil conspiracy. In addition, defendant provided a copy of a Chicago police department report indicating that five complaints had been filed against Boudreau between April 1, 1991, to December 31, 1995.

¶ 24    Finally, defendant attached a memorandum written in 1990 in connection with the Goldston report prepared by the City of Chicago's office of police standards documenting the allegations of 50 different suspects concerning misconduct by Area 2 personnel from 1973-1986.

¶ 25    Defendant also asserted in his supplemental postconviction petition that the State committed a violation of *Brady v. Maryland,* 373 U.S. 83 (1963), by failing to provide him with evidence reflecting a pattern and practice of misconduct by Halloran and Boudreau.

¶ 26    At the second stage, the postconviction court dismissed all of defendant's postconviction claims. Defendant appealed. We reversed and remanded for a third-stage evidentiary hearing to resolve two claims: (1) whether defendant's trial counsel provided ineffective assistance by failing to investigate and prepare an alibi defense; and (2) whether the State violated defendant's right to due process by using the grand jury testimony of Crosby and the handwritten statement of McCoy,

both of which allegedly were coerced by Halloran and Boudreau. *People v. Gardner*, 2013 IL App (1st) 110341-U.

¶ 27    Regarding the ineffective assistance of counsel claim, defendant's girlfriend, Edwards, testified at the evidentiary hearing that on Friday, January 21, 1994, defendant drove her and their daughter to his mother's (Brown's) house to spend the weekend there. On Sunday, January 23, defendant spent the afternoon in Brown's house watching a football game on television while Edwards cared for their daughter. After the game finished at about 6 p.m., Edwards left to go home. At defendant's trial, Edwards was available to testify that defendant was at Brown's house watching football at the time of the victim's beating, but she never was contacted or interviewed by defendant's counsel.

¶ 28    Brown similarly testified that defendant, Edwards, and their daughter stayed with her at her house during the weekend of January 23, 1994. They left around 6:30 or 7 p.m. on January 23 after watching a football game. At defendant's trial, Brown was available to testify that defendant was at her house at the time of the victim's beating, but she never was contacted or interviewed by defendant's counsel.

¶ 29    Defendant testified that prior to trial, in December 1996 or January 1997, he met with his trial counsel at the jail and stated that he was with Edwards and Brown at the time of the beating. Defendant had another conversation with counsel in July 1997 in the judge's "bullpen" during which he again stated that Edwards and Brown were available to testify to his alibi. Two months before trial, defendant had a third conversation with counsel in his law office and they again discussed Edward's and Brown's potential alibi testimony.

¶ 30    Defendant's trial counsel testified that he has been a criminal defense attorney for 52 years and that he represented defendant during his criminal trial. Counsel no longer has defendant's trial

file, nor does he remember having any conversations with defendant about a possible alibi. He does not remember being told that Edwards and Brown were potential alibi witnesses. Counsel stated that it was his "standard practice" to talk to his clients about their possible defenses, and that if he had been informed about a possible alibi for defendant, he would have followed up by conducting an investigation and talking to the alibi witnesses.

¶ 31 Regarding the due process claim about coerced statements, McCoy testified on direct examination that while he was in custody on charges unrelated to this case, he was handcuffed to a wall and interrogated by two detectives named "Bruce and Holligan, something like that." The detectives told McCoy to implicate defendant in the victim's beating. McCoy refused, and the detectives then choked and punched him and threatened to charge him with more crimes. To prevent further abuse at the hands of the officers, McCoy signed a statement in March 1999 implicating defendant.

¶ 32 On cross examination, McCoy testified that the officers choked him and punched him in the ribs multiple times over three days. They also threatened to charge him with other murders. An ASA was present in the room when he was being choked by the officers, but she did nothing to stop them.

¶ 33 McCoy identified an affidavit he signed in May 2010. In the affidavit, McCoy stated that police supplied all the information in his statement against defendant and that he signed it because they were choking him and threatening to send him to the hospital. The affidavit identified Boudreau and Halloran as two of the detectives who interrogated him, but it did not specifically state that either Boudreau or Halloran choked or struck him. McCoy testified at the hearing, though, that he knew Boudreau was one of the detectives who had punched and choked him.

¶ 34    Crosby had died by the time of the evidentiary hearing. Defendant offered her trial testimony, in which she disavowed her grand jury testimony, as an exhibit.

¶ 35    Halloran testified that on January 23, 1994, he and Boudreau were assigned to investigate the victim's death in this case. They drove to Crosby's apartment at about 11:30 p.m. on January 24 and she told them that the murder had occurred there. They observed blood in the apartment and furniture in disarray, including a dining room table that was on its side against a wall and missing a table leg. They called the crime lab to process the murder scene.

¶ 36    The officers subsequently drove Crosby to the police station in the early morning on January 25 and interviewed her. During the interview, they never threatened to take away Crosby's children if she failed to sign a statement against defendant, nor did they threaten to charge her as an accessory to the victim's murder.

¶ 37    Crosby told the officers that subsequent to the murder, she was summoned to the parking lot by a BD gang leader named Quincy Ross. Ross walked her to a van that was occupied by defendant and other gang members. Defendant threatened to kill Crosby and her five children if she spoke to the police about the murder.

¶ 38    Upon hearing of this threat, the officers returned to Crosby's apartment, retrieved her children, and transported them to her sister's apartment. Then they returned to the police station and continued the interview. Crosby identified 10 photographs of different gang members, including defendant, and named all the gang members who participated in the victim's death. She subsequently related these same facts to the ASA, but she did not make a written statement. Later she testified before the grand jury.

¶ 39    Halloran also testified that he and Detective John Murray interviewed McCoy on March 24, 1999. During the interview, neither Halloran nor Murray threatened to put McCoy in the hospital if he refused to sign a statement, nor did they punch or choke McCoy.

¶ 40    McCoy told them that the BDs controlled the Building and sold narcotics. Defendant was the minister of the gang and McCoy was a member. On the day of the murder, the BDs were called to a mandatory meeting at Crosby's apartment to discipline the victim for a "violation." After the victim arrived, the BDs encircled him and asked him about some cocaine that was missing. When the victim denied any knowledge, they beat him for about 30 minutes. Defendant then stopped the beating and ordered the BDs to take a coat belonging to Crosby's boyfriend, Eugene Bradford, and place it on the victim, so that the police would think Bradford was involved in the beating. Defendant then directed the BDs to drive the victim away, which they did.

¶ 41    Boudreau testified similarly to Halloran that he and other detectives interviewed Crosby on January 25, 1994, at the police station. He denied that he or any of the other officers threatened to take away her children or charge her as an accessory to the victim's murder if she refused to sign a statement implicating defendant. He denied interviewing McCoy in connection with the victim's murder.

¶ 42    Defendant presented evidence of Boudreau's and Halloran's coercive tactics in other cases to show their pattern and practice of coercing witnesses and suspects into confessing. Malik Taylor testified that on September 20, 1995, he was arrested for murder and brought to the police station, where he was questioned by several detectives, including Boudreau and Halloran. When Taylor refused to respond to the questions, one of the detectives (other than Boudreau or Halloran) slapped him. Boudreau and Halloran were in the room at the time. Taylor signed an affidavit in May 2004 identifying Halloran as one of his interrogators. The affidavit did not name Boudreau.

¶ 43    Josephus Jackson testified that on March 8, 1998, he was arrested at a friend's home by Officers Boudreau, Halloran, and Coughlin and brought to the police station and handcuffed to a wall. Boudreau and Halloran came into his room and began questioning him about the murder of Nicole Delaney. Jackson denied any knowledge, and Boudreau repeatedly slapped him in the face. The officers left the room. Boudreau returned with a thick phone book, which he tied around Jackson's mid-section. Halloran then hit Jackson in the mid-section with a flashlight. Jackson yelled at them that he was innocent. The beating continued, and Jackson said he would make a statement. Halloran left to get the ASA, leaving Boudreau in the room with him. Boudreau proceeded to tell Jackson what to say in his statement.

¶ 44    When Halloran returned with the ASA, Jackson refused to make a statement and said that the officers had beaten him. Boudreau punched Jackson in the side to stop him from talking and asked the ASA to leave the room. The officers then cursed at Jackson and threatened to hurt his fiancé, who was in another room at the police station. They also threatened to charge his fiancé as an accessory and with obstruction of justice. Jackson continued to refuse to make a statement. Halloran put a plastic bag over Jackson's head, causing him to black out. When he woke up, Jackson again proclaimed his innocence. The officers responded that they were going to break him, and that they would do "the same thing" to his fiancé. Jackson was terrified, and so he signed the statement.

¶ 45    On cross examination, Jackson testified that he was charged with Delaney's murder and he filed a motion to suppress his statement. In the motion to suppress, Jackson alleged that Boudreau and Halloran struck and beat him and made various threats, but he did not allege that he was choked until he passed out. Jackson testified that after his conviction, he filed a postconviction petition alleging that he made the incriminatory statement to stop Boudreau and Halloran from beating

him. Jackson did not state in the postconviction petition that the officers had put a bag over his head or threatened to harm his fiancé.

¶ 46    Jackson also testified that in 2021 he filed a claim against Boudreau and Halloran with the Illinois Torture Inquiry and Review Commission (TIRC). The claim was denied.

¶ 47    In addition to the testimony of Taylor and Jackson, defendant submitted voluminous documentary "pattern and practice" evidence relating to allegations of abusive or coercive conduct against Boudreau and Halloran in other cases. Such evidence included: an affidavit and deposition testimony from Arnold Day, who related how Boudreau choked him in February 1992 during an interrogation; an affidavit from Kylin Little relating how Boudreau struck him in the chest and head, while Halloran held him down, during an interrogation in 1996; Nicholas Escamilla's affidavit and section 2-1401 petition relating that Halloran and Boudreau punched, slapped and spit on him and made threats against his pregnant wife and daughter to extract a false confession from him in 1993; complaints filed in federal court by Derrick Flewellen, Keith Walker, and Harold Hill, alleging that Halloran and Boudreau used physical violence such as beating, kicking, and/or choking them to extract false confessions from them in the 1990's; Halloran's deposition testimony in Hill's case, in which he asserted his fifth amendment rights when questioned whether he coerced witnesses; various appellate court opinions remanding for new suppression hearings or postconviction evidentiary hearings based on the evidence of a pattern of systemic abuse by Halloran and Boudreau; an Illinois Supreme Court opinion (*People v. Washington*, 2023 IL 127952) granting the defendant there a certificate of innocence after finding that Halloran and Boudreau coerced a false confession from him; reports prepared in October 2021 by various advocacy groups charting how the TIRC found seven credible claims of coercion against Boudreau and nine credible claims of coercion against Halloran; and TIRC dispositions finding that there

was sufficient evidence that Boudreau and Halloran tortured Kilroy Watkins in 1992, and that Halloran tortured Corey Hodges in 2002, to merit judicial review.

¶ 48    Halloran and Boudreau were questioned at the hearing about the pattern and practice evidence. Halloran denied slapping, threatening, or physically abusing Taylor. Halloran denied that either he or any other detectives punched, slapped, choked or threatened Jackson, nor did any of them hit him with a flashlight. Halloran also denied putting a plastic bag over Jackson's head.

¶ 49    Halloran denied interviewing Flewellen, Reyna, or Little, or striking Escamilla, and he denied ever torturing a witness into providing a false statement against a suspect. Halloran also denied ever torturing a suspect to obtain a confession.

¶ 50    Boudreau denied slapping Taylor. He denied putting a book against Jackson's midsection and striking him on it with a flashlight. He did not punch, choke, or threaten Jackson or coach him as to what to say. He did not place a plastic bag over Jackson's head.

¶ 51    Boudreau denied threatening or abusing David Wright, Derrick Flewellen, Terrell Swift, Harold Hill, Dwayne Washington, Nicholas Escamilla, Tyrone Reyna, and Kylan Little. Boudreau also generally denied ever torturing any suspect to obtain a confession, and he also denied ever torturing or coercing a witness into providing a false statement against a suspect. He denied ever threatening a family member of a suspect or witness to obtain a confession or statement.

¶ 52    Halloran and Boudreau both admitted working with Officer Jon Burge and previously asserting their fifth amendment rights when questioned about cases they had worked on under Burge's command.

¶ 53    Following all the evidence, the circuit court denied defendant's postconviction petition. Defendant appeals.

¶ 54    The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2022)) establishes a three-stage mechanism by which a criminal defendant can assert that his conviction and sentence were the result of a substantial denial of his constitutional rights. *People v. English*, 2013 IL 112890, ¶ 21. In this case, the petition advanced to a third-stage, evidentiary hearing, at which defendant was required to prove a denial of his constitutional rights by a preponderance of the evidence. *People v. Coleman*, 2013 IL 113307, ¶ 92. In determining whether defendant proved a constitutional violation, the circuit court may consider affidavits, depositions, testimony, or other evidence. 725 ILCS 5/122-6 (West 2022). The court resolves any conflicts in the evidence and determines witness credibility and the weight to be given the evidence. *People v. Jackson*, 2020 IL App (1st) 143025-B, ¶ 29. Where the third-stage hearing involves fact-finding and credibility determinations, the circuit court's decision will not be reversed unless manifestly erroneous (*English*, 2013 IL 112890, ¶ 23), meaning that the opposite conclusion is clearly evident (*Coleman*, 2013 IL 113307, ¶ 98) or that the finding was arbitrary, unreasonable or not based on the evidence presented. *People v. Ballard*, 206 Ill. 2d 151, 162 (2002).

¶ 55    First, we address the circuit court's denial of defendant's postconviction claim that his substantive due process rights were violated at his jury trial when the State used Crosby's grand jury testimony and McCoy's handwritten statement implicating him. Defendant contends that Crosby's grand jury testimony and McCoy's handwritten statement were both coerced by Halloran and Boudreau. Defendant has a due process right to a fair trial, which includes a trial without the use of coerced statements. *People v. Lee*, 2024 IL App (1st) 221268, ¶ 46; *People v. Bates*, 218 Ill. App. 3d 288, 297 (1991). The aim of the requirement of due process is to prevent fundamental unfairness in the use of evidence, regardless of whether that evidence is true or false. *People v. Mays*, 176 Ill. App. 3d 1027, 1035 (1988).

¶ 56    The circuit court found that neither Crosby's grand jury testimony nor McCoy's handwritten statement were coerced by Halloran and Boudreau. In so ruling, the court relied heavily on Halloran's and Boudreau's disavowals at the evidentiary hearing that they had ever threatened or coerced any witnesses, including Crosby and McCoy. The court recognized the evidence against Halloran and Boudreau of their pattern and practice of coercing statements from witnesses and suspects through physical abuse and threats against family members but determined that "it is difficult to give particular weight" [to the pattern and practice evidence] when witnesses [in the prior cases] aren't here to be examined and cross examined in person." Notwithstanding the pattern and practice evidence showing that Halloran and Boudreau committed similar methods of coercion/torture near the time of the current allegations, the court found that in *this case* their disavowals of any type of coercion against Crosby and McCoy were believable.

¶ 57    The circuit court's findings here regarding the credibility of Halloran and Boudreau were similar to those made in *People v. Anderson*, 2024 IL App (1st) 200462-B. In *Anderson*, the defendant submitted a claim to the TIRC alleging that his convictions in two underlying cases resulted from his torture by various Chicago police officers, including Halloran and Boudreau. *Id.* ¶ 1. The TIRC found sufficient evidence of torture to refer the matter to the circuit court for judicial review (*id.* ¶ 2), which is akin to the third stage of a postconviction proceeding. *People v. Gibson*, 2018 IL App (1st) 162177, ¶ 85.

¶ 58    The trial court conducted an evidentiary hearing, at which the defendant testified that Halloran and Boudreau punched him in the chest and hand during their interrogation of him. *Anderson*, 2024 IL App (1st) 200462-B, ¶ 64. Halloran and Boudreau testified at the hearing and denied striking the defendant. *Id.* ¶ 105, ¶ 108. The defendant submitted voluminous documentary evidence of Halloran and Boudreau's pattern and practice of coercing statements in various cases,

including some of the same pattern and practice evidence admitted in the instant case. *Id.* ¶ 95. The trial court entered an order denying the defendant relief, finding no credible evidence that Halloran or Boudreau struck him and that the pattern and practice evidence was either irrelevant or that the defendant had waived reliance on such evidence or that there was insufficient evidence to support the prior claims of abuse or coercion. *Id.* ¶¶ 132, 137, 142.

¶ 59    We vacated the defendant's convictions, reversed the judgment of the trial court and remanded for a new trial, holding that the court abused its discretion by disregarding all pattern and practice evidence as irrelevant. *Id.* ¶ 179. We noted that prior allegations of police abuse may be relevant when they involve the same officers using similar methods of torture near the time of the current allegations (*id.* ¶ 181), yet the trial court's decision contained virtually no discussion of whether the numerous prior allegations were factually similar to the defendant's alleged abuse. *Id.* ¶ 184. We further found that the trial court's credibility determinations were against the manifest weight of the evidence, where the defendant's "core allegations of abuse and coercion" remained consistent for about 30 years, and where the officers' credibility was "substantially (if not completely) undermined by the plethora of similar allegations against them from the same time period." *Id.* ¶ 219. We stated:

> "[D]efendant submitted voluminous evidence establishing that the accused officers engaged in a pattern and practice of coercing confessions using techniques similar to, if not identical to, what defendant has consistently alleged. Under the totality of the record, we conclude it was manifestly erroneous for the trial court *not* to find that defendant had proved that police torture resulted in the confessions that led to his two underlying convictions." (Emphasis in the original.) *Id.*

¶ 60    We vacated the defendant's convictions and remanded for new trials without the inculpatory statements (*id.* ¶ 241), noting that to simply remand for a new suppression hearing at which the very same evidence would be presented would be a waste of judicial resources. *Id.* ¶ 235.

¶ 61    Similar to *Anderson*, Crosby and McCoy's core allegations of abuse and coercion relating to their identification of defendant have remained consistent for years. Crosby first recanted her identification of defendant in February 1994, only a few weeks after her grand jury testimony, and again in March 1994 and January 1998 and finally at defendant's trial in 1999. She consistently alleged that she falsely identified defendant at the grand jury only because officers had threatened to take away her children and charge her as an accessory unless she testified against defendant. Halloran and Boudreau were the officers who questioned Crosby about the victim's murder, elicited her statements allegedly identifying defendant, and removed her children to a family member's home.

¶ 62    McCoy gave his handwritten statement implicating defendant in March 1999 and recanted it four months later at defendant's trial. McCoy explained at defendant's trial that officers had supplied all the information in the statement and that he signed it only because a homicide detective choked him and threatened to send him to the hospital and to jail unless he identified defendant. In May 2010, McCoy signed an affidavit attesting consistently with his testimony at defendant's trial that the police had supplied the information in the statement, which he signed only because officers choked him and threatened to send him to the hospital. McCoy identified Halloran and Boudreau as two of the officers who interrogated him. At the evidentiary hearing in 2022, McCoy testified consistently with his trial testimony and affidavit that he made the written statement identifying defendant only because two detectives named "Bruce and Holligan, something like

- 19 -

that" choked and punched him and threatened to charge him with other crimes unless he signed. McCoy also specifically identified Boudreau as one of the officers who punched and choked him.

¶ 63    As in *Anderson*, defendant here introduced voluminous evidence of Halloran and Boudreau's pattern and practice of coercing suspects and witnesses into making incriminating statements. Defendant submitted the testimony of Taylor and Jackson as well as 28 exhibits totaling 967 pages, consisting of affidavits, deposition testimony, appellate court opinions, a supreme court opinion, and TIRC dispositions establishing that Halloran and Boudreau engaged in a pattern and practice of coercing confessions using techniques similar to those testified to by Crosby and McCoy. The circuit court admitted the pattern and practice evidence, but it stated that such evidence had little weight and there is no indication in the record that it ever read any of the materials submitted. Instead, the court credited Halloran and Boudreau's testimony denying coercing or torturing Crosby and McCoy in this case. We agree with *Anderson* that Halloran and Boudreau's "credibility is substantially (if not completely) undermined by the plethora of similar allegations against them from the same time period." *Id.* ¶ 219. By way of example, defendant's exhibits provided evidence that the officers physically coerced Day, Wright, Escamilla, Flewellen, Little, Walker, and Hill in a manner similar to the way in which they allegedly physically coerced McCoy and that they threatened to take away Escamilla's child similar to Crosby's assertion that she was threatened with the removal of her children. Defendant's exhibits further provided evidence that the officers threatened to charge Flewellen, Smith, and Anderson with other crimes, similar to the manner in which they allegedly threatened both McCoy and Crosby.

¶ 64    Under the totality of the record, including Crosby and McCoy's consistent and long-standing allegations of coercion, coupled with the voluminous testimonial and documentary evidence showing Halloran and Boudreau's pattern and practice of engaging in similar coercive

tactics during the same time period, we find that the circuit court manifestly erred by discounting the pattern and practice evidence and finding the officers credible. The denial of defendant's postconviction petition was manifestly erroneous because defendant proved by a preponderance of the evidence that police coercion resulted in Crosby's grand jury testimony and McCoy's handwritten statement implicating him and leading to his conviction. As in *Anderson*, we vacate defendant's conviction and remand for a new trial without Crosby and McCoy's inculpatory statements.

¶ 65     As the evidence at defendant's trial, including Crosby's grand jury testimony and McCoy's handwritten statement, was sufficient to prove him guilty of murder, his retrial presents no double jeopardy impediment. See *People v. Gill*, 2018 IL App (3d) 150594, ¶ 57 (when conducting the double jeopardy analysis, we consider all the evidence submitted to the jury, regardless of whether any of that evidence should have been suppressed or deemed inadmissible). This finding is only for purposes of double jeopardy, and we reach no conclusions as to defendant's guilt that are binding on retrial. See *People v. Naylor*, 229 Ill. 2d 584, 610-11 (2008).

¶ 66     For all the foregoing reasons, we vacate defendant's conviction and sentence, reverse the judgment of the circuit court denying defendant's postconviction petition, and remand for a new trial without Crosby and McCoy's inculpatory statements. As a result of our disposition of this case, we need not address the other arguments on appeal.

¶ 67     Reversed; murder conviction vacated and cause remanded with directions.